HENRY BROCH AND COMPANY, a co-partnership consisting of Henry Broch and Oscar Adler, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 12305.

United States Court of Appeals
Seventh Circuit.

Dec. 11, 1958.

Frederick M. Rowe, Chicago, Ill., Joseph Du Coeur, Washington, D. C., of Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Harold Orlinsky, Fred Herzog, Chicago, Ill., for petitioners.

James E. Corkey, Asst. Gen. Counsel, Federal Trade Commission, Washington,

D. C., Earl W. Kintner, Gen. Counsel, Alvin L. Berman, Miles J. Brown, Attys., Washington, D. C., for Federal Trade Commission.

Before DUFFY, Chief Judge, and SCHNACKENBERG and HASTINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Henry Broch and Oscar Adler, copartners trading as Henry Broch & Company, herein called petitioners or Broch, ask us to review the action of the Federal Trade Commission and set aside its cease and desist order of December 10, 1957, issued pursuant to a complaint charging petitioners with violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act.[1]

The complaint charged, in substance, that petitioners, while engaged in commerce as a broker or sales agent for seller principals, violated § 2(c) by granting and allowing a portion of their normal and customary brokerage fee to a particular buyer in connection with that buyer's purchase of food products in commerce from a particular seller.

In their answer petitioners admitted that they were engaged in commerce as a broker or sales representative of seller principals; that the then current price of the commodity involved in the sale cited by the complaint was $1.30 per gallon; that this price was reduced to $1.25 by the seller in the instance cited; and that, instead of being compensated by the seller at a previously agreed to rate of 5%, petitioners accepted a 3% brokerage payment on that sale. All other allegations of the complaint were denied.

Following hearings before an examiner and the filing of his initial decision, containing findings of fact, conclusion, and a cease and desist order, petitioners appealed to the Commission, which adopted the said findings, conclusion and order and entered the order now under attack.

■ In this court the examiner's findings of fact are not questioned.[2] The facts appearing therefrom are as follows:

Broch is a broker or sales representative for about 25 principals who sell food products, and negotiates an annual volume of sales approximately $4,000,000 to $5,000,000. Among these seller principals is Canada Foods, Ltd., (hereinafter referred to as Canada Foods) a Canadian processor of apple concentrate and similar products. Canada Foods was also represented in the United States by several other brokerage firms, including Tenser & Phipps, Poole & Company, and Cuylar. The sales involved in this case were made to the J. M. Smucker Company, Orville, Ohio (hereinafter referred to as Smucker), a manufacturer of apple butter and preserves.

During negotiations in April and May 1954, when petitioners agreed to act as broker for Canada Foods, their commission on sales was established at 5%. The brokers other than petitioners were appointed with the understanding that their rate of commission would be 4%. Petitioners received a higher rate of commission because they stocked merchandise in advance of sales.

On October 11, 1954, Canada Foods established its price on its 1954 pack of apple concentrate at $1.30 per gallon in 50-gallon steel drums, and it authorized its various brokers, including petitioners, to negotiate sales at that price.

The first attempt to sell the 1954 pack of Canada Foods' apple concentrate to Smucker was made, not by petitioners, but by Phipps (of Tenser & Phipps) who contacted Smucker on or about October 1, 1954, several weeks before petitioners

1. § 2(c), 49 Stat. 1527, 15 U.S.C.A. § 13 (c).

2. We are here confronted with our duty to apply the law to the facts and to determine whether respondent's process of legal reasoning when applied to the facts is correct. Standard Oil Co. v. Federal Trade Commission, 7 Cir., 233 F.2d 649, 651, affirmed 355 U.S. 396, 78 S.Ct. 369, 2 L.Ed.2d 359; Atalanta Trading Corp. v. Federal Trade Commission, 2 Cir., 258 F.2d 365, 368.

first contacted that buyer. Upon receiving the quotation on October 11, 1954, Phipps advised Smucker of the $1.30 price set by Canada Foods.

At some time between October 15 and 18, 1954, Smucker told Phipps that it was interested in purchasing approximately 500 barrels of the concentrate, but at a price lower than $1.30. This counter-proposal was transmitted to Canada Foods by Phipps on or about October 18, 1954, and was discussed in person with Canada Foods' manager on October 19, 1954. Canada Foods' manager told Phipps that $1.30 was Canada Foods' best price and that if it were not for a subsidy on apples by the Canadian Government, Canada Foods could not sell even at that low price. This decision of Canada Foods to hold to its established $1.30 price on the Smucker offer was immediately transmitted by Phipps to Smucker. On October 20, 1954, Phipps attempted to secure a 10-day option from Canada Foods for Smucker on 500 to 700 barrels of apple concentrate at the $1.30 price. Canada Foods replied by letter of October 25, 1954, refusing even to hold the $1.30 price for the period requested since, in its estimation, the price was liable to rise.

As late as October 26, 1954, Smucker specifically offered to purchase through Phipps 500 gallons of Canada Foods' concentrate at $1.25. Phipps wired the offer to Canada Foods that same day. On October 27, 1954, Canada Foods' manager telephoned Phipps, again stating that his lowest price was $1.30, and that the only way that the price could be lower would be if the brokerage was cut. Phipps relayed the information to Smucker, explaining that the order at $1.25 could not be confirmed since Phipps was afraid that this would constitute a violation of the Robinson-Patman Act.

A day or two before this last related event of October 27, 1954, Broch contacted Smucker in an effort to sell apple concentrate on behalf of Canada Foods. Smucker told Broch that it already had an offer from Canada Foods for $1.30 but that it would be interested in buying 500 drums at a lower price. With knowledge that Canada Foods, through another broker, was already negotiating to sell Smucker approximately 500 drums of concentrate and was holding to its $1.30 price, Broch called Canada Foods and stated it could make the sale if the price were $1.25 per gallon. Canada Foods took the proposition under advisement. On the following day, October 27, 1954, the day Canada Foods told Phipps that the price could be reduced below $1.30 only if brokerage were cut, Canada Foods telephoned Broch and advised that it would make the sale at $1.25 per gallon provided Broch would agree to reduce its commission from 5% to 3%. Broch agreed and advised Smucker that Canada Foods would sell to it at $1.25 per gallon. The sale of 500 steel drums of apple concentrate at $1.25 per gallon was consummated, delivery made, and Broch received 3% brokerage rather than the usual 5%.

The order contained in the examiner's initial decision and adopted by respondent required Broch to cease and desist from "paying * * * Smucker, * * any allowance or discount in lieu of brokerage * * * by selling * * * to such buyer at prices reflecting a reduction * * *, where * * * accompanied by a reduction in the regular rate of commission, brokerage * * * being paid to [petitioners] by such seller principal for brokerage service; * *."

The examiner's conclusion, which was adopted by the Commission, is that petitioners "granted and allowed, and are now granting and allowing, directly or indirectly, a portion of the commission or brokerage fee to which they are entitled from their seller principal, Canada Foods * * * to * * * Smucker * * *, a buyer of food products in commerce, in connection with such buyer's purchase of food products in commerce."

Before this court, counsel for respondent has specified the following language

from § 2(c) [3] as the basis for the order now being reviewed:

"That it shall be unlawful for any person engaged in commerce, * * * to pay or grant * * * anything of value as a commission, brokerage, * * * or any allowance or discount in lieu thereof, * * * either to [or from] the other party to such transaction * * * ."

In so specifying, respondent's counsel stated that he was interpolating the words "or from" following the word "to" in the phrase "to the other party." Of course, we do not concede that counsel has a right to add words that Congress failed to use.

The order of December 10, 1957 cannot stand.

 Neither the language of § 2(c) nor its legislative history [4] indicates that a seller's broker is covered by § 2(c). Accordingly we hold that petitioner, as seller's broker, did not violate § 2(c). In arriving at this result, we have carefully considered Oliver Bros., Inc., v. Federal Trade Commission, 4 Cir., 102 F.2d 763; Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667, and Quality Bakers of America v. Federal Trade Commission, 1 Cir., 114 F.2d 393, principally relied on by respondent. Each of these cases involved *buyers'* purchasing agents who were charged with receiving brokerage commissions from the sellers, which they passed on to the buyers. This fact is emphasized in the Great Atlantic & Pacific case, 106 F.2d at page 674, where the court said:

"* * * The question presented for our consideration is simply whether or not the vendee may be compensated for services rendered by the vendee's agent acting as agent for the vendors. * * *"

In the case before us, no agent of the buyer is involved. Petitioner is an agent solely of the seller.

 Respondent did not proceed against the buyer or the seller. Instead it interested itself in a private grievance between rival brokers, Tenser & Phipps and Broch. We doubt whether the public interest, which is involved in the Act, can be said to have been served by this proceeding against the seller's broker.

In Federal Trade Commission v. Klesner, 280 U.S. 19, 28, 50 S.Ct. 1, 4, 74 L.Ed. 138, the court said:

"* * * But the mere fact that it is to the interest of the community that private rights shall be respected is not enough to support a finding of public interest. To justify filing a complaint the public interest must be specific and substantial. Often it is so, because the unfair method employed threatens the existence of present or potential competition. * * *"

The effect of respondent's order is that the commissions of a seller's broker are rendered immune from reduction by the seller when it is negotiating for the sale of its food products, and hence such a reduction, when used as a basis for quotation of a lower price, is illegal. This would be true even though the buyer does not suggest or even know of the re-

3. 15 U.S.C.A. § 13(c), which reads:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

4. 80 Cong.Rec. 6281–82 (1936). See also 80 Cong.Rec. 3114, 7759–60 (1936); and Hearings Before the House of Representatives Judiciary Committee on Bills to Amend the Clayton Act, 74th Cong., 1st Sess. 37, 218, 258 (1935).

*duction* in the seller's brokerage commission, as in the case at bar.[5]

Respondent relies heavily upon respondent's adoption of a finding by the examiner that the only reasonable inference possible is that Broch's acceptance of a reduced brokerage constituted a payment of part of their commission to Smucker, exactly as though Broch had paid 2% "of their commission to the buyer direct." However, even if the seller were enabled to reduce its price to Smucker, on an extraordinarily large order, because of an agreement by seller's employees, its landlord or its advertising agency, to reduce their salaries, rent or fees, it would not be the equivalent of a "direct" payment by the employees, the landlord or the advertising agency, to Smucker, the buyer. The most that can be said is that, because of Broch's agreement to reduce its commission, the seller was able to reduce its price. Neither in substance nor in fact, directly or indirectly, did Broch pay anything to Smucker.

 Respondent's interpretation of § 2(c) would actually promote price rigidity and uniformity contrary to the national antitrust policy. In Federal Trade Commission v. Reed, 7 Cir., 243 F.2d 308, at page 309, certiorari denied 355 U.S. 823, 78 S.Ct. 29, 2 L.Ed.2d 37, we said:

> " * * * the history, purpose and decisional law concerning the Clayton and Federal Trade Commission Acts demonstrates that they are in pari materia—to be read and construed as one in such manner as to best effectuate the purpose of Congress in enacting them. * * "

 Obviously an important element in the cost of food distribution is the commission paid by sellers to their brokers. If a seller is to be forbidden to meet competition by reducing an item in its cost of distribution, then to that extent his costs are frozen without regard

for the welfare of the public which must ultimately defray the resultant costs of distribution.[6] Trade restraints in the distribution of groceries surely do not occupy a preferred antitrust position, as distinguished from comparable situations. Standard Oil Co. v. Federal Trade Commission, 1951, 340 U.S. 231, 248–250, 71 S.Ct. 240, 95 L.Ed. 239; 7 Cir., 1956, 233 F.2d 649, affirmed 1958, 355 U.S. 396, 78 S.Ct. 369, 2 L.Ed.2d 359.

For the foregoing reasons, the order of the Federal Trade Commission entered December 10, 1957 is set aside.

Order set aside.

---

5. This was established by the testimony of purchasing agent Kiefer of Smucker.

6. Cf. Simplicity Pattern Co. v. Federal Trade Commission, 103 U.S.App.D.C. 373, 258 F.2d 673, 683, certiorari granted 79 S.Ct. 223.