## FEDERAL TRADE COMMISSION *v.* HENRY BROCH & CO.

No. 61.   Argued January 14, 18, 1960.—Decided June 6, 1960.

*Daniel M. Friedman* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Daniel J. McCauley, Jr.* and *Alan B. Hobbes.*

*Frederick M. Rowe* argued the cause for respondent. With him on the brief were *Joseph DuCoeur* and *Harold Orlinsky.*

*Henry J. Bison, Jr.* argued the cause and filed a brief for the National Association of Retail Grocers of the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Section 2 (c) of the Clayton Act, as amended by the Robinson-Patman Act,[1] makes it unlawful for "any person" to make an allowance in lieu of "brokerage" to the "other party to such transaction." The question is whether that prohibition is applicable to the following transactions by respondent.

Respondent is a broker or sales representative for a number of principals who sell food products. One of the principals is Canada Foods Ltd., a processor of apple concentrate and other products. Respondent agreed to act for the Canada Foods for a 5% commission. Other brokers working for the same principal were promised a 4% commission. Respondent's commission was higher because it stocked merchandise in advance of sales. Canada Foods established a price for its 1954 pack of apple concentrate at $1.30 per gallon in 50-gallon drums and authorized its brokers to negotiate sales at that price.

The J. M. Smucker Co., a buyer, negotiated with another broker, Phipps, also working for Canada Foods, for apple concentrate. Smucker wanted a lower price than $1.30 but Canada Foods would not agree. Smucker finally offered $1.25 for a 500-gallon purchase. That was turned

---

[1] Section 2 (c) makes it unlawful for *"any person . . .* to pay or grant . . . anything of value as a commission, brokerage, or other compensation, or *any allowance or discount in lieu thereof,* except for services rendered in connection with the sale or purchase of goods . . . either to the other party to such transaction or to an . . . intermediary therein . . . ." (Emphasis supplied.) 49 Stat. 1527.

down by Canada Foods, acting through Phipps. Canada Foods took the position that the only way the price could be lowered would be through reduction in brokerage. About the same time respondent was negotiating with Smucker. Canada Foods told respondent what it had told Phipps, that the price to the buyer could be reduced only if the brokerage were cut; and it added that it would make the sale at $1.25—the buyer's bid—if respondent would agree to reduce its brokerage from 5% to 3%. Respondent agreed and the sale was consummated at that price and for that brokerage. The reduced price of $1.25 was thereafter granted Smucker on subsequent sales. But on sales to all other customers, whether through respondent or other brokers, the price continued to be $1.30 and in each instance respondent received the full 5% commission. Only on sales through respondent to Smucker were the selling price and the brokerage reduced.

The customary brokerage fee of 5% to respondent would have been $2,036.84. The actual brokerage of 3% received by respondent was $1,222.11. The reduction of brokerage was $814.73 which is 50% of the total price reduction of $1,629.47 granted by Canada Foods to Smucker.

The Commission charged respondent with violating § 2 (c) of the Act, and after a hearing and the making of findings entered a cease-and-desist order against respondent. The Court of Appeals, while not questioning the findings of fact of the Commission, reversed. 261 F. 2d 725. The case is here on writ of certiorari, 360 U. S. 908.

The Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power. A lengthy investigation revealed that large chain buyers were obtaining competitive advantages in several ways other than direct price

concessions[2] and were thus avoiding the impact of the Clayton Act.[3]   One of the favorite means of obtaining an indirect price concession was by setting up "dummy" brokers who were employed by the buyer and who, in many cases, rendered no services.   The large buyers demanded that the seller pay "brokerage" to these fictitious brokers who then turned it over to their employer. This practice was one of the chief targets of § 2 (c) of the Act.[4]   But it was not the only means by which the brokerage function was abused[5] and Congress in its wisdom phrased § 2 (c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination.[6]

---

[2] See Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess. (1935).

[3] Section 2 of the Clayton Act as originally enacted in 1914 (38 Stat. 730) applied only to price discriminations the effect of which was to "substantially lessen competition or tend to create a monopoly." This section was modified and retained in § 2 (a) as amended by the Robinson-Patman Act.   See note 7, *infra.*

[4] See S. Rep. No. 1502, 74th Cong., 2d Sess., p. 7; H. R. Rep. No. 2287, 74th Cong., 2d Sess., pp. 14–15; *Federal Trade Comm'n* v. *Simplicity Pattern Co.,* 360 U. S. 55, 69.

[5] In the Final Report on the Chain-Store Investigation, note 2, *supra,* Congress had before it examples not only of large buyers demanding the payment of brokerage to their agents but also instances where buyers demanded discounts, allowances, or outright price reductions based on the theory that fewer brokerage services were needed in sales to these particular buyers, or that no brokerage services were necessary at all.   *Id.,* at 25, 63.   These transactions were described in the report as the giving of "allowances in lieu of brokerage" (*id.,* at 62) or "discount[s] in lieu of brokerage." *Id.,* at 27.

[6] The Report of the House Judiciary Committee described the brokerage provision as dealing "with the abuse of the brokerage function for purposes of oppressive discrimination." H. R. Rep. No. 2287, 74th Cong., 2d Sess., p. 14.   And although not mentioned in the Committee Reports, the debates on the bill show clearly that

The particular evil at which § 2 (c) is aimed can be as easily perpetrated by a seller's broker as by the seller himself. The seller and his broker can of course agree on any brokerage fee that they wish. Yet when they agree upon one, only to reduce it when necessary to meet the demands of a favored buyer, they use the reduction in brokerage to undermine the policy of § 2 (c). The seller's broker is clearly "any person" as the words are used in § 2 (c)—as clearly such as a buyer's broker.

It is urged that the seller is free to pass on to the buyer in the form of a price reduction any differential between his ordinary brokerage expense and the brokerage commission which he pays on a particular sale because § 2 (a) [7] of the Act permits price differentials based on savings in selling costs resulting from differing methods of distribution. From this premise it is reasoned that a seller's broker should not be held to have violated § 2 (c) for having done that which is permitted under § 2 (a). We need not decide the validity of that premise, because the fact that a transaction may not violate one section of the Act does not answer the question whether another section has been violated. Section 2 (c), with which we

---

§ 2 (c) was intended to proscribe other practices such as the "bribing" of a seller's broker by the buyer. See 80 Cong. Rec. 7759–7760, 8111–8112.

[7] Section 2 (a), 15 U. S. C. § 13 (a), provides, in relevant part: "It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing . . . shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are . . . sold or delivered."

are here concerned, is independent of § 2 (a) and was enacted by Congress because § 2 (a) was not considered adequate to deal with abuses of the brokerage function.[8]

Before the Act was passed the large buyers, who maintained their own elaborate purchasing departments and therefore did not need the services of a seller's broker because they bought their merchandise directly from the seller, demanded and received allowances reflecting these savings in the cost of distribution. In many cases they required that "brokerage" be paid to their own purchasing agents. After the Act was passed they discarded the façade of "brokerage" and merely received a price reduction equivalent to the seller's ordinary brokerage expenses in sales to other customers. When haled before the Commission, they protested that the transaction was not covered by § 2 (c) but, since it was a price reduction, was governed by § 2 (a). They also argued that because no brokerage services were needed or used in sales to them, they were entitled to a price differential reflecting this cost saving. Congress had anticipated such a contention by the "in lieu thereof" provision.[9] Accord-

---

[8] The bill as reported from the Senate Committee excepted savings in brokerage from the cost proviso in § 2 (a). S. Rep. No. 1502, 74th Cong., 2d Sess., p. 5. Yet when the bill was finally passed, the reference to brokerage in § 2 (a) had been deleted. This was done, according to the Conference Report, "for the reason that the matter of brokerage is dealt with in a subsequent subsection of the bill." H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess., p. 6. By striking the words "other than brokerage" from § 2 (a) we think Congress showed both an intention that "legitimacy" of brokerage be governed entirely by § 2 (c) and an understanding that the language of § 2 (c) was sufficiently broad to cover allowances to buyers in the form of price concessions which reflect a differential in brokerage costs. The legislative history is barren of any indication that a change in substance was intended by this deletion. Indeed, the Conference Report clearly precludes any other inference.

[9] The brokerage clause in the bill was originally directed only at outright commission payments by sellers to buyers' agents. The

ingly, the Commission [10] and the courts [11] early rejected the contention that such a price reduction was lawful because the buyer's purchasing organization had saved the seller the amount of his ordinary brokerage expense.

In *Great Atlantic & Pacific Tea Co.* v. *Federal Trade Comm'n*, 106 F. 2d 667 (C. A. 3d Cir. 1939), a buyer sought to evade § 2 (c) by accepting price reductions equivalent to the seller's normal brokerage payments. The court upheld the Commission's view that the price reduction was an allowance in lieu of brokerage under § 2 (c) and was prohibited even though, in fact, the seller had "saved" his brokerage expense by dealing directly with the select buyer. The buyer also sought to justify its

---

Senate added the phrases "or any allowance or discount in lieu thereof," and "either to the other party to such transaction [or his intermediary]." S. Rep. No. 1502, 74th Cong., 2d Sess., p. 7. "This phrasing of the law was obviously designed to prevent evasion of the restriction through a mere modification of the form of the sales contract. It was assumed that large buyers would seek to convert the brokerage which they had hitherto received into an outright price reduction." Zorn and Feldman, Business Under the New Price Laws (1937), 219.

[10] The Commission has held that a price reduction to favored buyers, who bought direct without the intervention of a broker, which was equivalent to brokerage currently paid by the seller to its brokers for sales to other customers was a violation of § 2 (c). It has issued cease-and-desist orders against buyers in, *e. g., The Great Atlantic & Pacific Tea Co.*, 26 F. T. C. 486 (1938), aff'd 106 F. 2d 667 (C. A. 3d Cir. 1939); *General Grocer Co.*, 33 F. T. C. 377 (1941); *Giant Tiger Corporation*, 33 F. T. C. 830 (1941); *UCO Food Corporation*, 33 F. T. C. 924 (1941); *R. C. Williams & Co.*, 33 F. T. C. 1182 (1941); *A. Krasne, Inc.*, 34 F. T. C. 121 (1941); and against sellers in *Ramsdell Packing Co.*, 32 F. T. C. 1187 (1941); *The Union Malleable Mfg. Co.*, 52 F. T. C. 408 (1955). See also several memorandum decisions reported in 32 F. T. C. 1192, 1193 (1941).

[11] *Great Atlantic & Pacific Tea Co.* v. *Federal Trade Comm'n*, 106 F. 2d 667 (C. A. 3d Cir. 1939); *Southgate Brokerage Co.* v. *Federal Trade Comm'n*, 150 F. 2d 607 (C. A. 4th Cir. 1945) (buyer's broker buying and selling on his own behalf).

price reduction on the ground that it had rendered valuable services to the seller. The court rejected this argument also. Although that court's interpretation of the "services rendered" exception in § 2 (c) has been criticized,[12] its conclusion that the price reduction was an allowance in lieu of brokerage within the meaning of § 2 (c) has been followed [13] and accepted.[14]

We are asked to distinguish these precedents on the ground that there is no claim by the present buyer that the price reduction, concededly based in part on a saving to the seller of part of his regular brokerage cost on the particular sale, was justified by the elimination of services normally performed by the seller or his broker. There is no evidence that the buyer rendered any services to the seller or to the respondent nor that anything in its method of dealing justified its getting a discriminatory price by means of a reduced brokerage charge. We would have quite a different case if there were such evidence and we need not explore the applicability of § 2 (c) to such circumstances. One thing is clear—the absence of such evidence and the absence of a claim that the rendition of

---

[12] See Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) 192, 193; Oppenheim, Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy, 50 Mich. L. Rev. 1139, 1207, n. 178; Rowe, Price Discrimination, Competition, and Confusion: Another Look at Robinson-Patman, 60 Yale L. J. 929, 957–958.

[13] *Southgate Brokerage Co.* v. *Federal Trade Comm'n, supra,* note 11. See also cases cited, note 10, *supra.*

[14] In speaking of these interpretations of § 2 (c), a leading authority said:

"Here too the Commission and the court have applied the Congressional intent with precision. If Congress envisaged the evil as the transmission of brokerage commissions to the buyer, then to permit the buyer to get the same thing under 2 (a) in another form and name would deprive 2 (c) of all substance." Oppenheim, Administration of the Brokerage Provision of the Robinson-Patman Act, 8 Geo. Wash. L. Rev. 511, 535.

services or savings in distribution costs justified the allowance does not support the view that § 2 (c) has not been violated.

The fact that the buyer was not aware that its favored price was based in part on a discriminatory reduction in respondent's brokerage commission is immaterial. The Act is aimed at price discrimination, not conspiracy. The buyer's intent might be relevant were he charged with receiving an allowance in violation of § 2 (c). But certainly it has no bearing on whether the respondent has violated the law. The powerful buyer who demands a price concession is concerned only with getting it. He does not care whether it comes from the seller, the seller's broker, or both.

Congress enacted the Robinson-Patman Act to prevent sellers and sellers' brokers from yielding to the economic pressures of a large buying organization by granting unfair preferences in connection with the sale of goods. The form in which the buyer pressure is exerted is immaterial and proof of its existence is not required. It is rare that the motive in yielding to a buyer's demands is not the "necessity" for making the sale. An "independent" broker is not likely to be independent of the buyer's coercive bargaining power. He, like the seller, is constrained to favor the buyers with the most purchasing power. If respondent merely paid over part of his commission to the buyer, he clearly would have violated the Act. We see no distinction of substance between the two transactions. In each case the seller and his broker make a concession to the buyer as a consequence of his economic power. In both cases the result is that the buyer has received a discriminatory price. In both cases the seller's broker reduces his usual brokerage fee to get a particular contract. There is no difference in economic effect between the seller's broker splitting his brokerage

commission with the buyer [15] and his yielding part of the brokerage to the seller to be passed on to the buyer in the form of a lower price.[16]

We conclude that the statute clearly applies to payments or allowances by a seller's broker to the buyer, whether made directly to the buyer, or indirectly, through the seller. The allowances proscribed by § 2 (c) are those made by "any person" which, as we have said, clearly encompasses a seller's broker.[17] The respondent was a necessary party to the price reduction granted the buyer. His yielding of part of his brokerage to be passed on to the buyer was a *sine qua non* of the price reduction. This is not to say that every reduction in price, coupled with a reduction in brokerage, automatically compels the conclusion that an allowance "in lieu" of brokerage has been granted. As the Commission itself has made clear,

---

[15] See *Oliver Bros.* v. *Federal Trade Comm'n*, 102 F. 2d 763, 770 (C. A. 4th Cir.).

[16] The Conference Report states that § 2 (c) "prohibits the *direct* or *indirect* payment of brokerage except for such services rendered." (Italics supplied.) H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess., p. 7.

[17] Several writers, including one of the coauthors of the Act, have viewed § 2 (c) as covering payments or allowances by sellers' brokers for the benefit of particular buyers. See Patman, The Robinson-Patman Act (1938), 102, 108; Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act, Am. L. Inst. (rev. ed. 1953), 108. (See also 2d rev. ed., 1959, 116); Oppenheim, Administration of the Brokerage Provision of the Robinson-Patman Act, 8 Geo. Wash. L. Rev. 511, 544 (1940); Edwards, The Price Discrimination Law (1959), 104. As Patman, *op. cit.*, *supra*, at 102, states respecting seller's brokerage, "To waive the cost of the brokerage or commission to one purchaser and assess it against another represents an unfair discrimination between the purchasers, is an attempt to divorce one item of cost from the rest when, in fact, they all make up the whole, and permits a practice to gain foothold which may increase in such proportions as to demoralize the industry of which it is a part."

whether such a reduction is tantamount to a discriminatory payment of brokerage depends on the circumstances of each case. *Main Fish Co., Inc.*, 53 F. T. C. 88. Nor does this "fuse" provisions of § 2 (a), which permits the defense of cost justification, with those of § 2 (c) which does not; it but realistically interprets the prohibitions of § 2 (c) as including an independent broker's allowance of a reduced brokerage to obtain a particular order.

It is suggested that reversal of this case would establish an irrevocable floor under commission rates. We think that view has no foundation in fact or in law. Both before and after the sales to Smucker, respondent continued to charge the usual 5% on sales to other buyers. There is nothing in the Act, nor is there anything in this case, to require him to continue to charge 5% on sales to all customers.[18] A price reduction based upon alleged savings in brokerage expenses is an "allowance in lieu of brokerage" when given only to favored customers. Had respondent, for example, agreed to accept a 3% commission on all sales to all buyers there plainly would be no room for finding that the price reductions were violations of § 2 (c). Neither the legislative history nor the purposes of the Act would require such an absurd result, and neither the Commission nor the courts have ever suggested it. Here, however, the reduction in brokerage was made to obtain this particular order and this order only and therefore was clearly discriminatory.

The applicability of § 2 (c) to sellers' brokers under circumstances not distinguishable in principle from the present case is supported by a 20-year-old administrative interpretation. Beginning in 1940, four years after the Act was passed, the Commission restrained the

---

[18] Cf. *Robinson* v. *Stanley Home Products, Inc.*, 272 F. 2d 601 (C. A. 1st Cir.), where it was held that § 2 (c) was not violated by a seller who eliminated the services of a broker entirely, converted to direct selling, and thereafter reduced his prices.

practice of brokers who, whether buying and selling on their own account or acting on behalf of the seller, sold goods to purchasers who bought through them direct at a reduced price reflecting the savings made by the elimination of the services of a local broker. This practice was held to be a violation of § 2 (c), not § 2 (a).[19]

If we held that § 2 (c) is not applicable here, we would disregard the history which we have delineated, overturn a settled administrative practice, and approve a construction that is hostile to the statutory scheme—one that would leave a large loophole in the Act. Any doubts as to the wisdom of the economic theory embodied in the statute are questions for Congress to resolve.

· *Reversed.*

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

The Court holds, in effect, that the action of an independent broker, engaged by a seller, in reducing his contract rate of commission for the purpose of enabling the seller to make a sale to a buyer at a reduced price, constitutes the granting of an allowance in lieu ·of "brokerage" by the broker to the buyer, in violation of § 2 (c) of the

---

[19] See *Albert W. Sisk & Son,* 31 F. T. C. 1543 (1940); *C. F. Unruh Brokerage Co.,* 31 F. T. C. 1557 (1940); *C. G. Reaburn & Co.,* 31 F. T. C. 1565 (1940); *William Silver & Co.,* 31 F. T. C. 1589 (1940); *H. M. Ruff & Son,* 31 F. T. C. 1573 (1940); *Thomas Roberts & Co.,* 31 F. T. C. 1551 (1940); *American Brokerage Co.,* 31 F. T. C. 1581 (1940); *W. E. Robinson & Co.,* 32 F. T. C. 370 (1941); *Custom House Packing Corp.,* 43 F. T. C. 164 (1946).

We need not view this administrative practice as laying down an absolute rule that § 2 (c) is violated by the passing on of savings in broker's commissions to direct buyers, for here, as we have emphasized, the "savings" in brokerage were passed on to a single buyer who was not shown in any way to have deserved favored treatment.

Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (c).

Respondent, an independent broker of Chicago, Illinois, was engaged by Canada Foods, Ltd., of Kentville, Nova Scotia, to procure orders for its products upon a commission or "brokerage" basis of 5% of the amount of the sales made. Other independent brokers in the United States were similarly engaged by Canada Foods, but upon a commission or brokerage basis of 4%. Canada Foods had announced a price of $1.30 per gallon for its apple concentrate. Respondent and another independent broker, both acting on behalf of Canada Foods, separately solicited the J. M. Smucker Company of Orrville, Ohio, for an order for that product. Smucker was willing to purchase a quantity of the product, but would pay only $1.25 per gallon for it. Finally, respondent agreed with Canada Foods to reduce its commission or brokerage to 3% in order to permit the latter to accept the Smucker order. Thereupon, Canada Foods accepted and filled the order, and thereafter paid respondent a commission of 3% as agreed. Smucker, the buyer, was not advised that respondent had agreed to reduce its commission charge to the seller.

Thereafter, in what appears to be the first proceeding of this type, the Federal Trade Commission charged respondent with granting and allowing the buyer a portion of its brokerage fee, in violation of § 2 (c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (c), and, after hearing, entered a cease-and-desist order against it. The Court of Appeals reversed, holding that respondent, an independent seller's broker, was not covered by § 2 (c), and moreover had not paid anything of value as a commission, brokerage, or other compensation to the buyer. 261 F. 2d 725. We granted certiorari, 360 U. S. 908.

In reversing the Court of Appeals, the Court now holds that § 2 (c) "clearly applies to payments or allowances by a seller's broker to the buyer, whether made directly to the buyer, or indirectly, through the seller." In my view, no such question is presented on the admitted facts of this case, and the Court's holding is not supported by the terms nor the object of § 2 (c), but is actually opposed to its declared purpose as shown by its legislative history.

Section 2 (c) makes it "unlawful for any person . . . to pay or grant . . . anything of value as a *commission, brokerage, or other compensation, or any allowance or discount in lieu thereof,* except for services rendered in connection with the sale or purchase of goods . . . either *to the other party* to such transaction *or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf . . . of any party to such transaction other than the person by whom such compensation is so granted or paid."* [1] (Emphasis added.)

The phrase "any person" in § 2 (c) includes, of course, even a truly independent seller's broker. But that only poses the true question, which is whether an agreement by such a broker to reduce his commission charge to the seller, thus enabling the seller to reduce its price, constitutes the paying or granting by the broker of *"anything*

---

[1] Section 2 (c), 15 U. S. C. § 13 (c), provides in full that:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

*of value as a commission, brokerage, or other compensation,"* or an *"allowance or discount in lieu thereof,"* to the buyer.

There is no contention here that the buyer made any claim for "anything of value *as a commission, brokerage, or other compensation* . . . for services rendered in connection with the . . . purchase of [the] goods," either directly or through any intermediary. Rather, it is conceded that the buyer did not even know that respondent had agreed with the seller to reduce its commission charge. Nor is there any claim that respondent was "acting in fact for or in behalf . . . of any party to such transaction other than the [seller] by whom [the concession in price was] granted." Rather, it is conceded that it was not. Nor, indeed, is there any claim that respondent actually paid "anything of value *as a commission, brokerage or other compensation"* to the buyer or to any intermediary who was "acting in fact for or in [its] behalf." What and all respondent did was to reduce its charge to the seller for its services from 5% to 3%. It must surely be clear that this did not constitute a violation by respondent of the terms of § 2 (c). For if it did, then all legitimate commission rates are frozen in destruction of competition, and in actual violation of the antitrust laws.

I turn now to the purpose of § 2 (c) as shown by its legislative history. The motivating factor behind the enactment of § 2 (c) was the elimination of the practice by large buyers of demanding and receiving price concessions in the guise of "dummy brokerage" payments and "allowances" for "services" claimed to have been rendered to sellers, but which were not actually performed.[2] It

---

[2] "Among the prevalent modes of discrimination at which this bill is directed, is the practice of certain large buyers to demand the allowance of brokerage direct to them upon their purchases, or its payment to an employee, agent, or corporate subsidiary whom they

was Congress' purpose to eliminate that evil. Accordingly, it designed § 2 (c) to prohibit payments or allowances of "anything of value as a commission, brokerage, or other compensation" by a seller to a buyer, directly or through an intermediary, "where such intermediary is acting in fact for or in behalf [of the buyer]." [3]  Although Congress took the view that neither a party to the transaction nor his intermediary could perform legitimate services for the *other* party, § 2 (c) was not intended to and did not proscribe payments by a seller or a buyer to

set up in the guise of a broker, and through whom they demand that sales to them be made. Whether employed by the buyer in good faith to find a source of supply, or by the seller to find a market, the broker so employed discharges a sound economic function and is entitled to appropriate compensation by the one in whose interest he so serves. But to permit its payment or allowance where no such service is rendered, where in fact, if a 'broker,' so labeled, enters the picture at all, it is one whom the buyer points out to the seller, rather than one who brings the buyer to the seller, is but to permit the corruption of this function to the purposes of competitive discrimination. The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume." S. Rep. No. 1502, 74th Cong., 2d Sess., p. 7. See also H. R. Rep. No. 2287, 74th Cong., 2d Sess., pp. 14–15.

[3] "Section [(c)] permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf: Likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits the direct or indirect payment of brokerage except for such services rendered. It prohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary acting in fact for or in behalf, or subject to the direct or indirect control, of the other." H. R. Rep. No. 2287, 74th Cong., 2d Sess., p. 15. See also the Conference Committee Report, H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess., p. 7.

his *own* broker for services actually rendered to him, nor did Congress intend to fix or freeze brokerage rates or otherwise interfere with such legitimate brokerage operations.[4] The purpose of § 2 (c), as shown by the legislative history referred to, was not to embrace or affect legitimately negotiated rates of commission for brokers' services.

As I have pointed out, this is not a case where *the buyer* has claimed or received, either directly or through its intermediary, any "brokerage" "allowance," or discount in price, *as compensation for services*.[5] Nor has the *buyer* obtained any allowance or discount because of any "savings" claimed to have been effected for the seller through elimination by the *buyer or his broker* of services normally performed by the *seller or his broker*.[6] I am,

---

[4] As stated by Senator Logan on the Senate floor:
"The bill has nothing to do with brokerage at all. The bill deals with schemes and shams used to bring about discriminations in prices. . . . A legitimate broker can charge whatever his employer may be willing to pay without the violation of any provisions of the proposed act." 80 Cong. Rec. 3118.

"I shall now speak of the matter of brokerage. Let me say in the beginning that the bill does not affect legitimate brokerage either directly or indirectly. Where the broker renders service to the buyer or to the seller the bill does not prohibit the payment of brokerage. It is not aimed at the legitimate practice of brokerage, because brokerage is necessary. The broker has a field all his own and he should not be interfered with." 80 Cong. Rec. 6281.

[5] See *Biddle Purchasing Co.* v. *Federal Trade Comm'n*, 96 F. 2d 687 (C. A. 2d Cir.); *Oliver Bros., Inc.*, v. *Federal Trade Comm'n*, 102 F. 2d 763 (C. A. 4th Cir.).

[6] See *Great Atlantic & Pacific Tea Co.* v. *Federal Trade Comm'n*, 106 F. 2d 667 (C. A. 3d Cir.), and *Southgate Brokerage Co.* v. *Federal Trade Comm'n*, 150 F. 2d 607 (C. A. 4th Cir.), in which the buyer claimed to have effected a "saving" in distribution costs for the seller because of services performed by the buyer's purchasing

therefore, unable to see or understand how it may be thought that the action of respondent in reducing its charge to the seller from 5% to 3% constituted the granting, either directly or indirectly, of "*a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof*" to the buyer, within the meaning of those terms as used in § 2 (c). Since this case does not in any way involve any payment or allowance for services claimed to have been performed by the buyer or his intermediary, it is simply not the type or kind of case that is covered and governed by § 2 (c). Inasmuch as the legislative history of § 2 (c) shows that Congress did not intend that section to affect negotiated charges for legitimate brokerage services, I submit that the Court ought not so extend it by construction.

Until today, it seems always to have been generally understood that a truly independent broker, such as respondent, was free to negotiate the rate or amount of his commissions with his principal without fear of violating § 2 (c).[7] Such was the expressed congressional intention.[8] Surely if the rate or amount of respondent's commissions for services rendered to Canada Foods had been left to negotiation on each sale, no one would contend that an agreement by respondent to accept a commission of 3% for the sale in question would violate § 2 (c). Likewise, there could be no violation of § 2 (c) if, instead of dealing through a broker who charged a 5% commission, the

organization. Such cases must be distinguished from those in which the nature of the seller's own operation, without more, enables it to effect legitimate savings in brokerage and other distribution costs.

[7] See, *e. g.*, Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) 190–191; Oppenheim, Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy, 50 Mich. L. Rev. 1139, 1207, n. 178.

[8] See note 4.

seller had dealt through a broker who charged only 3%. But the Court now holds that an independent seller's broker who has once agreed with the seller on a general rate of commission may not renegotiate that rate with his principal in order to effect a sale that would otherwise be lost to him. The fact that respondent and the seller had previously entered into an agreement concerning commission rates should not, in my view, be controlling, for I can see no sound reason why the seller and his broker must regard such an agreement as establishing an irrevocable floor under commission rates or amounts in order to avoid antitrust consequences. The Court's holding appears to me to be an unwarranted interference with legitimate brokerage operations, in direct contravention of congressional intent.

Quite obviously, the Court's real concern in this case is with the price reduction which this particular buyer has received. But, while it was the aim of the Robinson-Patman Act to eliminate discriminatory price advantages which particular buyers might obtain through unfair means, it should be borne in mind that Congress did not choose to condemn *all* price differences between purchasers. Section 2 (a), designed to deal with outright price discriminations between purchasers which may lessen competition, contains, for example, a proviso to the effect that "nothing . . . shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered." [9] This proviso was

---

[9] Section 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (a), provides, in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be

incorporated for the purpose of "preserving for the public the benefits of efficient marketing methods while at the same time subjecting to the prohibitions of the statute those 'unearned' price differentials which could not be reasonably related to some savings in the seller's costs of manufacture, sale, or delivery." Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), p. 171. See also H. R. Rep. No. 2287, 74th Cong., 2d Sess., pp. 9–10.

It was the evident intention of Congress in § 2 (a) to permit sellers to pass through to buyers, in the form of reduced prices, any *true savings* in the cost of distribution of their goods. There appears to be no basis for ascribing to Congress an intention by § 2 (c) to require a seller who uses the services of a broker in some sales to do so in all sales, or to require that brokerage rates be static. Yet this would be the effect of the Commission's contention that a sale made directly by such a seller to a buyer at a price that does not include any brokerage constitutes the granting by the seller to the buyer of brokerage or an allowance in lieu of brokerage under § 2 (c).[10]  Since a

---

substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . ."

[10] The Commission has expressed such a view in several early proceedings, see, *e. g., Albert W. Sisk & Son,* 31 F. T. C. 1543 (1940); *C. F. Unruh Brokerage Co.,* 31 F. T. C. 1557 (1940); *W. E. Robinson & Co.,* 32 F. T. C. 370 (1941); *Ramsdell Packing Co.,* 32 F. T. C. 1187 (1941); *Custom House Packing Corp.,* 43 F. T. C. 164 (1946), but that view is in conflict with the terms of § 2 (c) and does not accord with the congressional intent.

reduction (or even elimination) of legitimate brokerage fees paid by the seller to an independent broker representing him might well constitute a *true saving* in the cost of one phase of the marketing process, such a reduction may, in proper circumstances, validly justify a reduction in price to a particular buyer.[11] Once this fact is recognized, and is coupled with an understanding that the real purpose of § 2 (c) was to prohibit allowances by a seller based on services claimed to have been performed,

---

[11] When § 2 (a) emerged from the Senate Committee, the "cost justification" proviso contained an addition to the clause, permitting: ". . . differentials which make only due allowance for differences in the cost, *other than brokerage*, of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered. . . ." (Emphasis added.)

This addition was explained as having been deemed necessary "to harmonize this subsection with subsection [(c)] considered below, which deals directly with the question of brokerage." S. Rep. No. 1502, 74th Cong., 2d Sess., p. 5.

In discussion on the Senate floor with respect to this addition, Senator Logan commented:

"I think perhaps legitimate brokerage ought to be allowed as a part of the costs; and I think when the bill was drafted—I did not write the bill—perhaps in the amendment which was inserted by the Judiciary Committee of the Senate we had in mind dummy brokerage, sham brokerage. It may be that something should be done about that. I call it to the attention of the Senate, so that some of the other Senators may consider it." 80 Cong. Rec. 6285.

The Conference Committee then deleted the phrase "other than brokerage" from the proviso, "for the reason that the matter of brokerage is dealt with in a subsequent subsection of the bill." H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess., p. 6.

In view of the meaning of "brokerage" as used in § 2 (c) and the elimination of the phrase "other than brokerage" from the "cost justification" proviso, it seems clear to me that a reduction in price based on savings in *legitimate* brokerage costs is among the reductions which Congress intended might be validly justified under the § 2 (a) proviso.

to the benefit of the seller, *by the buyer or his broker*, I would think there is no choice but to conclude that the transaction here in question was one which Congress contemplated would be actionable only in a proceeding under § 2 (a), subject to any valid "cost justification" defense. The high standards of proof required to sustain a "cost justification" defense in a § 2 (a) proceeding eliminate any possibility of establishing as a *true cost saving* any reduction in brokerage commissions made as a subterfuge for the granting of an allowance or discount as a rebate to a buyer, whether or not as the result of coercive pressure of the buyer upon the seller or his broker.[12]

However, under the expansive reading which the Court now gives § 2 (c), in opposition, I believe, to its legislative history, this provision may now be applied to prohibit a price reduction granted by a seller to a buyer, even though such price reduction may be well based solely on true savings arising from a reduction in the cost of legitimate brokerage services performed *by the seller's own broker*. I am unable to perceive any basis for a conclusion that respondent's reduction of its brokerage charge to the seller, and the seller's consequent reduction in price to the buyer, violated the provisions of § 2 (c). That conclusion seems to me to be an obvious thwarting of the intention of Congress to allow *true cost savings* to be passed through to buyers.

---

[12] I intimate no view on whether a valid "cost justification" defense would be available in a § 2 (a) proceeding on the facts of this case.

The Court of Appeals for the First Circuit has recently recognized the fundamental differences between § 2 (a) and § 2 (c), discussed here. *Robinson* v. *Stanley Home Products, Inc.*, 272 F. 2d 601. See generally, Note, 57 Mich. L. Rev. 926.

Of course, § 2 (f) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (f), which makes it "unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section," may be applicable in a proceeding against the buyer.

Indeed, the Court itself seems to display some concern for the potential sweep of today's decision.  It declares that its interpretation of the statute includes "an independent broker's allowance of a reduced brokerage to obtain a particular order," and it is at pains to point out that "the reduction in brokerage was made to obtain this particular order and this order only and therefore was clearly discriminatory."  The Court also asserts that its holding in this case should *not* be understood to mean "that every reduction in price, coupled with a reduction in brokerage, automatically compels the conclusion that an allowance 'in lieu' of brokerage has been granted," indicating that "whether such a reduction is tantamount to a discriminatory payment of brokerage depends on the circumstances of each case."  Even further, the Court makes it clear that it does *not* intend to approve any absolute rule that § 2 (c) is violated in every case where savings in brokerage are passed on to buyers—justifying its holding in this case by stating that "the 'savings' in brokerage were passed on to a single buyer who was not shown in any way to have deserved favored treatment."

To me these efforts by the Court to so limit its holding represent a clear recognition of the fact that in some cases a reduction or elimination of brokerage costs might well justify a valid reduction in price by a seller to a particular buyer, and, in such cases, the Court is apparently quite prepared to hold that § 2 (c) would not be violated.  But as I read § 2 (c), either its terms are not applicable to *any* case where a price reduction results from a reduction in the seller's legitimate brokerage costs, or they are applicable to *all* such cases.  Section 2 (c) does *not* expressly require discrimination between purchasers as an element of its proscriptions, nor does *it* provide any defenses based on legitimate savings in brokerage costs; only § 2 (a) contains such provisions.  And as we said just last Term, in

construing § 2 (e) of the Act, "[w]e cannot supply what Congress has studiously omitted." *Federal Trade Comm'n* v. *Simplicity Pattern Co.,* 360 U. S. 55, 67.

I can only conclude that, by leaving the door open for cases in which a reduction in price based on a saving in the seller's brokerage costs may, in its view, be validly justified, the Court has done one of two things. Either it has, in this § 2 (c) case, recognized and applied the true purposes and policies underlying § 2 (a), tested the validity of a "cost justification" defense in this case under *that section,* and concluded *sub silentio* that none could be made out here, or it has, despite our holding in *Simplicity Pattern, supra,* and notwithstanding its own disclaimer, fused the provisions of § 2 (a) with those of § 2 (c) and thereby weakened materially the *per se* thrust which Congress intended that § 2 (c), when applicable, would have.

In my view, § 2 (c) is not applicable to *any* case of this type, for in such a case there is no payment of "brokerage" or an "allowance or discount in lieu thereof" to the buyer, as I understand the meaning of those terms as used in the statute. For me, *every* case presenting this type of situation is actionable only under § 2 (a), for it seems clear that § 2 (a), which is expressly concerned with discrimination between purchasers, with effects on competition, and with the possible existence of true cost savings, was designed by Congress to cover this type of case. And in a § 2 (a) proceeding, the challenged party will be afforded an opportunity to establish the validity of the price reduction in question—an opportunity not afforded under the terms of § 2 (c). The Court's adroit footwork in this regard serves quite effectively to illustrate the reasons why I think the case before us is one which Congress intended should be actionable under § 2 (a), rather than § 2 (c), and I would therefore affirm the judgment of the Court of Appeals.