THOMASVILLE CHAIR COMPANY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 18996.

United States Court of Appeals
Fifth Circuit.

Aug. 14, 1962.

Raymond S. Smethurst, Washington, D. C., Robert N. Ryan, New Orleans, La.,

Raymond S. Smethurst, Jr., Salisbury, Md., for petitioner, Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel.

Emerson K. Elkins, Atty., J. B. Truly, Asst. Gen. Counsel, James McI. Henderson, Gen. Counsel, J. Lane Morthland, Atty., Federal Trade Commission, Washington, D. C., for Federal Trade Commission.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

■ This is a petition by Thomasville Chair Company, a large manufacturer of household furniture, to review and set aside an order of the Federal Trade Commission. While there are numerous grounds asserted by petitioner for the setting aside the cease and desist order entered by the Federal Trade Commission, we do not reach most of these because we conclude that the case must be remanded to the Commission for further consideration, since its action was premised on an incorrect legal conclusion. This conclusion was that it is a violation of Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, for a manufacturer to grant to a purchaser a discount or lower price if such discount or lower price is even partially based on a saving to the manufacturer resulting from a saving in commission paid to the manufacturer's salesman, even though such different rates of commission may be justified by "differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are * * * sold or delivered."

Basic for an understanding of this case are the provisions of Sections 2(a) and 2(c) of the Clayton Act, as amended, 15 U.S.C.A. §§ 13(a) and 13(c).[1] The relevant parts of subsection (a) are that, notwithstanding the general prohibition against a price discrimination between different purchasers of commodities of like grade and quality, the Act does not prevent differentials which result from differences in the cost of sale resulting from differing methods or quantities in which the commodities are sold. The relevant portion of subsection (c) is that a manufacturer may not, in order to give a lower price to a customer, pass on to the customer anything of value "as a commission, brokerage, or other compensation."

The essential facts, for the purpose of this opinion are not in dispute: Thomasville Chair Company sells all of its products through the efforts of some forty salesmen, who work strictly on a commission basis. These salesmen pay their own expenses, including automobile and other travel expenses; each of them has an assigned territory. The company has two classes of customers. It has ap-

1. These two sections are as follows:
Subsection 2(a), in pertinent part:
"That it shall be unlawful for any person engaged in commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly * * * or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing * * * shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are * * * sold or delivered."

Subsection 2(c):
"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

proximately 200 which are known as "jobbers," or "J" accounts, and approximately 4500 "carload" or "CL" customers. The company has, for at least thirty-five years maintained these two classes of accounts.

It was the position of the petitioner that in general these customers were those that accounted for a volume of approximately $50,000 worth of purchases per annum, or who bought as much as two carloads per quarter or season, the carload dollar value varying from $5,000 to $11,000. It was also stated, however, that these classifications were not strictly on an annual basis and that if a customer had the financial stability and the potential sales volume to be able to dispose of as much as eight carloads per annum, he would not be cut off the "J" list if, over a several year period, his average approximated the annual volume. The evidence shows, however, that there were some customers on the "J" list during several of the years under investigation who did not meet the standard during some of the years covered by the exhibit. It appears, however, that as to substantially all of these whose purchases were analyzed by the commission they had all been removed from the "J" list prior to the filing of the complaint. The examiner, in commenting on these facts, stated:

> "While the record indicates that in a few isolated instances, due probably to oversight, this [volume of sales] criterion has not been adhered to, it seems clear that respondent has in good faith sought to maintain the integrity of the classification."

For a period of time, running back as long as 35 years, the company has sold its products to "J" customers at a price approximately 5% less than the price charged to the "CL" customers. These prices are published in company price lists made available to the respective classes of customers. For the same period of time the company's salesmen have been employed on a basis of 6% sales commission on all sales to "CL" customers and 3% on all sales to "J" customers. Evidence was introduced, which was not disputed, to the effect that the salesmen considered the differential in the commissions they earned as being justified by the difference in sales effort and expense which they expended with reference to the "J" customers and the "CL" customers. Other evidence was introduced by the company undertaking to show that entirely without reference to the savings of sales commission on sales to the "J" customers, there was a cost justification based on quantity and method of production, sales, or delivery that warranted the 5% reduction in any event. Contrary evidence was introduced on behalf of the commission and the commission found that the evidence of such savings did not equal as much as 5% in the case of the "J" customers, exclusive of the 3% differential which the company saved by not having to pay it to its salesmen as commissions for sales to the "J" customers.[2]

It appears to us that the commission made two basic errors in reaching its conclusion that the cease and desist order should issue. It first took the $50,000 per year figure as the sole and exact criterion by which the company justified placing its larger customers on the "J" list. In doing so, it completely overlooked the undisputed testimony to the effect that this list was a list of customers who *generally averaged approximately $50,000 in purchases or eight carloads of furniture per year over a several-year course.* If in fact the carloads were sold for as little as $5,000, many more of the "J" customers met the dollar standard of $40,000 per year than if the criterion was

---

2. While this finding would normally be binding on us if supported by substantial evidence in the record as a whole, petitioner contends that this proceeding was not commenced by the Commission as a § 2(a) violation and that it therefore did not fully prove cost justification exclusive of the alleged "passing on" of the sales commission. This may be urged to the Commission for its further consideration on remand.

firmly fixed at $50,000. Moreover, the commission also overlooked entirely the undisputed testimony that the "J" list could not be accurately kept strictly on an annual basis, since orders of one year frequently were filled the following year, and it also apparently overlooked the fact that in practically all the exceptions to the volume test, the petitioner had removed the customers from the "J" list prior to the commencement of the proceedings.

The only finding of fact dealing with this classification of customers as it related to the differential in sales commissions was, "the purchases of many of the jobber accounts however have amounted to substantially less than $50,000 per year. Consequently, it would appear that annual volume of purchases of at least $50,000 has not been the criterion used by respondent in determining which customer will receive the 5% price reduction." Thereupon, the commission, without finding that there was no proper or reasonable or legal criterion based on volume of sales, which was fully open to it on the evidence, concluded that there was *no* legal criterion for the maintenance of the list of "J" customers. This was its second error.

While it is obvious that the company could not legally justify a lower price to a customer who was not entitled to such lower price by reason of falling within the exceptions contained in Section 2(a), the granting of such lower price to a relatively small number out of the 200 "J" customers would not have the legal effect of vitiating the classification of a volume-of-sales basis as to those who actually met the criterion. However, having found that a criterion, not contended for by the plaintiff, was not adequately established as to *all* the "J" customers, the commission rejected it and any other volume-of-sales test completely. Its order was couched in the following terms:

"Respondent * * * do forthwith cease and desist from: paying, granting or allowing, directly or indirectly, to any buyer or to any one acting for or on behalf of or who is subject to the direct or indirect control of such buyer, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, by selling household furniture to any buyer at prices lower than the prices at which such furniture is sold to any other buyer, where such reductions in prices *reflect any saving in any sales commission or fee or any part or percentage thereof."*

Much of the proceedings before the examiner were had in absence of the guidance which has now been given both the commission and to industry as to the meaning of Section 2(c), which the Supreme Court dealt with extensively in Federal Trade Commission v. Henry Broch & Co., 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). The petitioner here took the position that Section 2(c) did not apply to commission salesmen standing in relation to the manufacturer as do the salesmen for Thomasville Chair Company. This issue was completely put at rest by the Supreme Court in the Broch case. We conclude, therefore, that unless the classification of customers by Thomasville Chair Company was justified by differences in the cost to Thomasville "of manufacture, sale, or delivery resulting from the different methods or quantities in which such commodities are * * * sold or delivered," (Section 2 (a)), then it would be open for the commission to infer that the payment by Thomasville of less than the full commission to the salesmen for sales to the "J" customers, combined with a reduction in price of the commodities to the "J" customers constituted the granting of an allowance or discount in lieu of commissions, prohibited by Section 2(c). The commission argues further, however, that the holding in the Broch case prevents the passing on of a saving in a salesman's commission to a certain class of customers even where the existence of the class and the charging of a lower commission by the salesmen for sales to the class are justified by differences in the

costs of sale resulting from differing methods of sales or quantities in which the commodities are sold or delivered. We think the Supreme Court rejected this proposition expressly when it stated:

"This is not to say that every reduction in price, coupled with a reduction in brokerage, automatically compels the conclusion that an allowance 'in lieu' of brokerage has been granted. As the Commission itself has made clear, whether such a reduction is tantamount to a discriminatory payment of brokerage depends on the circumstances of each case."

In the Broch case, the reduction in price charged to the favored customer was a reduction which was made solely for the purpose of effecting a sale to a single customer whose circumstances did not distinguish it, either in quantity of sales or method of sales or cost of delivery, or any other justified circumstance, from all other purchasers served by Broch and Company. Touching on this matter, the Court said as to its opinion:

"It but realistically interprets the prohibitions of § 2(c) as including an independent broker's allowance of a reduced brokerage *to obtain a particular order*." (Emphasis added).

The Court further accentuates the effect of its holding where it says,

"Here, however, the reduction in brokerage was made to obtain this particular order and this order only and therefore was clearly discriminatory."

Again, in footnote 19 on p. 177, 80 S. Ct. on p. 1164 the Court said:

"We have emphasized, the 'savings' in brokerage were passed on to a single buyer *who was not shown in any way to have deserved favored treatment*."

█ In the case now before the Court, there is no such fact situation. We recognize that the Supreme Court has clearly and definitely held that even though the language of Section 2(a) may be broad enough to warrant the precise reduction in price that was put into effect by Broch and Company in the case then before the Supreme Court, the prohibitions of Section 2(c) are to be read independently and thus to that extent modify the broad proviso of Section 2(a). However, as we read it, the Court's opinion says that a reduction in price, giving effect to reduced commissions paid by the seller, are violations of Section 2(c) only if such reduction in price is "discriminatory." We read that to mean "without justification based on actual bona fide differences in the costs of sales resulting from the differing methods or quantities in which such commodities are sold or delivered."

It thus became necessary for the commission to permit a full scale inquiry into the propriety of the maintenance by Thomasville Chair Company of the "J" list of customers based upon the differentials permitted under Section 2(a) of the Act, and also a full inquiry as to whether the company's long standing contract with its salesmen under which they received a smaller commission for sales to this list of customers, could be legally justified. If it could, then there is no violation of Section 2(c).

To the extent that the commission made a finding at all with respect to the criterion for the establishment of the "J" list, its finding was not supported by the evidence, in that it set a criterion which was of a higher volume than warranted by the evidence, and then found a substantially higher failure to meet the criterion than would be warranted if the test had been properly determined.

We can not, of course, hold, as a matter of law, that there was no violation of Section 2(c). We do conclude, however, that the commission applied an incorrect legal principle to its decision, in that it seems to have held that a reduction in commissions accompanied by a reduction in price, was a *per se* violation of Section 2(c), if the entire price reduction can not be justified on a cost basis exclusive of the commission differential. This, at least, was the effect of the commission's

decision by the manner in which it dealt with the "J" list of customers. This, as we have shown above, is a theory rejected by the Supreme Court. See Federal Trade Commission v. Henry Broch and Company, 363 U.S. 166, at page 175, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). See also Robinson v. Stanley Home Products Co., 1st Cir., 272 F.2d 601 and see 30 Geo. Washington Law Rev. 137, for an intelligent discussion of this question.

The order of the commission is set aside and the matter is remanded to the commission for further proceedings not inconsistent with this opinion.