820 F.2d 98
 55 USLW 2690, 1987-1 Trade Cases 67,574
 Gordon O. WHITE, M.D., d/b/a Gordon O. White, Plaintiff-Appellant,
v.
ROCKINGHAM RADIOLOGISTS, LTD.; N.M. Canter, Jr., M.D.;
Rockingham Memorial Hospital; Shenandoah Shared
Hospital Services, Inc., Defendant-Appellees.
 No. 86-1627.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 8, 1987.
Decided May 27, 1987.
 
 Joel Marbury Rainer, Atlanta, Ga. (Jack C. Basham, Jr., Parker, Hudson, Rainer & Dobbs, Atlanta, Ga., William A. Julias, Julias, Blatt & Blatt, P.C., Harrisonburg, Va., on brief), for plaintiff-appellant.
 Jonathan Jay Litten (Donald D. Litten, Litten, Sipe and Miller), Harrisonburg, Va., John Jeffries Miles (Mary Susan Philip, Powers, Pyles, Sutter & Miles, Washington, D.C., Phillip C. Stone, Wharton, Aldhizer & Weaver, Harrisonburg, Va., James G. Welsh, Timberlake, Smith, Thomas & Moses, P.C., Staunton, Va., Frank A. Thomas, III, Shackelford & Honenberger, Richmond, Va., on brief), for defendants-appellees.
 Before CHAPMAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and SIMONS, Senior District Judge for the District of South Carolina, sitting by designation.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Gordon O. White, M.D., appeals the district court's grant of summary judgment to Rockingham Memorial Hospital, Rockingham Radiologists, Ltd., Norman O. Canter, Jr., M.D., and Shenandoah Shared Hospital Services, Inc. (SSHS), on Dr. White's charges of antitrust violations arising out of the hospital's choice of Rockingham Radiologists as the official interpreters of computerized tomographic (CT) head scans.
 
 
 2
 The district court, correctly applying the standard for summary judgment, concluded that there was insufficient evidence to warrant a jury trial for conspiracy, tying, and group boycott under Sec. 1 of the Sherman Act and of monopolization, attempted monopolization, and conspiracy under Sec. 2. We affirm.[1]
 
 
 3
 * Accreditation organizations and regulatory agencies require that each patient's hospital record contain an official interpretation of the results of procedures such as x-ray, EEG, and CT scans. Although hospitals do not preclude physicians from interpreting their patients' tests, insurance companies and other third-party payors, such as Medicare and Medicaid, pay only for official interpretations. Consequently, while Dr. White can interpret head scans, he is effectively precluded from billing insurance carriers, Medicare, and Medicaid for his unofficial interpretations.
 
 
 4
 Dr. White is a neurologist with offices in Harrisonburg, Virginia, who has staff privileges at Rockingham Memorial. He is also associated with physicians in Charlottesville, Virginia, who own a CT scanner. Before Rockingham Memorial had access to a scanner, its patients were sent to Charlottesville and Dr. White made the official interpretation of their head scans for Rockingham's records. His competency to make head scan interpretations is not questioned. Also, he is the official interpreter for all EEG procedures administered at Rockingham.
 
 
 5
 Rockingham Memorial, a nonprofit institution, is the only hospital in Rockingham County, Virginia. Rockingham Radiologists, Ltd., a professional corporation consisting of six radiologists, furnishes all x-ray services in the hospital. The radiologists are competent to supervise the operation of a CT scanner and to interpret head and other scans. The hospital receives no part of the radiologists' fees.
 
 
 6
 Rockingham Memorial and two other hospitals in the Shenandoah Valley formed SSHS, a nonprofit corporation, to lower costs by sharing services relating to pharmacies, repair of equipment, and various feasibility studies. In 1981, the hospitals and SSHS established a CT steering committee, consisting of SSHS representatives, one radiologist, and one administrator from each hospital to consider the feasibility of acquiring expensive CT equipment for the hospitals. The steering committee decided that SSHS should acquire a mobile CT scanner for use at all three hospitals.
 
 
 7
 As a condition of granting a certificate of need, the state health systems agency required that radiologists directly supervise the CT scanner and that each hospital have access to a neurologist or neurosurgeon. Accordingly, the SSHS policy and procedural manual designated the radiologists to supervise the scans, which were to be administered by technicians employed by SSHS. Dr. White was identified as the neurologist for Rockingham Hospital.
 
 
 8
 After the scanner was put into service, the radiologists made all official interpretations. Dr. White asked the hospital president for authorization to make official interpretations of his patients' head scans. Told that this was a matter for the medical staff, he sought and received authority from the staff to perform and charge for this service. The radiologists resisted, claiming that they were entitled to interpret all scans.
 
 
 9
 The radiologists and Dr. White each sought the hospital's approval to make official interpretations of head scans. Negotiations continued over the next several months. Dr. White rejected a compromise under which he would share the responsibility and fees for official interpretations of CT scans on his patients with the radiologists. Finally, at a meeting of the hospital's board of directors, both the radiologists and Dr. White presented their positions. The board chose the radiologists as the official interpreters of all CT scans, on grounds that one entity should be responsible for the entire CT operation. The board permitted Dr. White to provide an unofficial interpretation to his patients.
 
 II
 
 10
 In his first cause of action, Dr. White alleged that Rockingham Memorial, the radiologists, SSHS, and other conspirators who were not named as defendants violated Sec. 1 of the Sherman Act, which makes unlawful any "contract, combination ..., or conspiracy, in restraint of trade." 15 U.S.C. Sec. 1.
 
 
 11
 To survive a motion for summary judgment in an antitrust conspiracy case, a plaintiff must establish that there is a genuine issue of material fact whether defendants entered into an illegal conspiracy that caused the plaintiff to suffer a cognizable injury. Matsushida Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). When the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." See Fed.R.Civ.P. 56(e); Celotex Corporation v. Catrett, --- U.S. ----, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 12
 For summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion," United States v. Diebold, Inc. 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the Court has cautioned that
 
 
 13
 [t]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery ... against a party who fails ... to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact."
 
 
 14
 Celotex Corp., 106 S.Ct. at 2252-53. There is no genuine issue for trial unless sufficient evidence favors the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 
 15
 Dr. White cites as direct evidence of a conspiracy a letter Dr. Canter, president of Radiologists, Ltd., wrote to Dr. White after the medical staff meeting, a letter the radiologists submitted to the hospital board on March 29, 1983, and the SSHS policy manual. As indirect evidence he cites "competition between radiologists and neurologists over who is better qualified to provide CT scanning services," failure of the hospital's radiologists and SSHS to consult him about the purchase of a CT scanner, and formation of the SSHS steering committee which gave control over the CT scanner to the radiologists. He also complains about the radiologists' refusal to accept the hospital staff's vote supporting his request to render the official interpretation of head scans, the hospital's proposed "anti-competitive" compromise, and ultimate referral of the dispute to the hospital board.
 
 
 16
 Concerted activity is the essential element of Dr. White's claim under Section 1 of the Act. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir.1985). But conduct as consistent with permissible competition as with illegal conspiracy does not itself support an inference of antitrust conspiracy. The party opposing summary judgment must present evidence that tends to exclude the possibility that the alleged conspirators acted independently: "[t]hat is, there must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve an unlawful objective." See Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).
 
 
 17
 Tested by these principles, the evidence on which Dr. White relies to show a conspiracy is insufficient to warrant its submission to a jury. His primary direct evidence, the letter from Dr. Canter, does no more than unilaterally state the radiologists' position.[2]
 
 
 18
 The portion of the letter from the radiologists to the trustees on which Dr. White relies states:
 
 
 19
 It is the understanding of the radiological group at R.M.H. that we have been placed in charge of this program by SSHS. The program has been established by mutual cooperation of SSHS and the x-ray departments of all three hospitals. Protocol has been established and set up.
 
 
 20
 The letter is correct in stating that SSHS had placed the radiologists in charge of the scanning program. The letter, however, is significant for what it did not say. The radiologists did not state that SSHS or the steering committee designated them as the official interpreters. The letter argued that since the radiologists were in charge of the operation of the scanner, they should be chosen as the official interpreters. It is apparent that the radiologists were stating their position as strongly as possible in order to induce the board to act favorably.
 
 
 21
 The third item of direct evidence on which Dr. White relies is the SSHS policy manual which assigns the responsibility for CT scanning to the radiologists in their respective hospitals. The manual deals with chest, abdominal, pelvic, and many other scans. Dr. White does not contend that he is entitled to supervise these scans, but he claims he is competent and, if necessary, willing to supervise his patients' head scans.
 
 
 22
 The manual complies with the condition imposed by the state in the certificate of need regarding supervision by radiologists. It describes in detail the procedures for inpatient, outpatient, and emergency scans that its technicians and hospital radiologists must follow. But nowhere does the policy manual designate which physician shall interpret the scans. Moreover, the executive secretary of SSHS unequivocally denied that SSHS designated official interpreters.
 
 
 23
 Neither Dr. White nor other neurologists, surgeons, or internists were members of the SSHS CT steering committee, but Dr. White attended one meeting and there is no evidence that he was barred from making suggestions and recommendations about either the need for a scanner or the kind that should be purchased. Neither the medical staff nor the board considered that SSHS had designated the radiologists as the official interpreters, for both staff and board made their own choices. One of the other participating hospitals also recognized that SSHS had not designated radiologists as official interpreters, for it designated a neurologist.
 
 
 24
 The district court properly held that Dr. White's direct and circumstantial evidence was insufficient for a jury to find a conspiracy among the radiologists, SSHS, the participating hospitals, and their officials. The evidence conclusively establishes that the hospital's board acted unilaterally. It decided that assigning full responsibility for scans to the radiologists, rather than fragmenting accountability, would best serve the interests of patients and promote efficient use of the scanner.[3] There is no evidence that "reasonably tends to prove ... 'a conscious commitment to a common scheme designed to achieve an unlawful objective.' " Monsanto, 465 U.S. at 764, 104 S.Ct. at 1471.
 
 
 25
 The absence of proof of a conspiracy also supports the district court's entry of summary judgment against Dr. White on his claims of a group boycott, which requires an agreement among competitors, and illegal price fixing, which also requires concerted action. See Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (group boycott); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129 (1940) (price fixing).
 
 III
 
 26
 Dr. White also alleged that Rockingham Memorial's arrangement with the radiologists for the official interpretations of CT scans is a per se unlawful tying of "medical/surgical hospital services" and "CT scanning services" in violation of Sec. 1 of the Sherman Act. The district court assumed that Rockingham Hospital, the only hospital in Rockingham County, has an "overwhelming dominance in the medical/surgical hospital services market" in the county. Nevertheless, it held that Dr. White had failed as a matter of law to show actionable tying. On appeal Dr. White complains that the district court failed to understand that his allegation of tying embraced "a tying market of hospital CT scan services and a tied product market of professional CT scanning services." Even with this modification of his claim, Dr. White cannot prevail.
 
 
 27
 In a tying arrangement, a party agrees to sell a tying product only on condition that the buyer purchases a different tied product or agrees not to purchase that product from any other supplier. A tying agreement is illegal "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).
 
 
 28
 We first consider Dr. White's allegation that the tying product is the hospital's medical and surgical services and the tied product is CT scanning services. His claim must fail, as the district court pointed out, because the hospital has not exploited its control over its medical and surgical services to force any patient to get a CT scan. The hospital does not own or operate the CT scanner. The hospital does not require each of its patients to undergo a scan. The patient's physician determines whether a scan is needed. Because the hospital has not exploited its control over medical or surgical services by requiring patients to have CT scans, Dr. White has not established an essential element of an illegal tying arrangement. See Jefferson Parish, 466 U.S. at 12, 104 S.Ct. at 1558.
 
 
 29
 Nor can Dr. White prevail on his second theory, which describes the tying product as hospital CT scans and the tied product as professional CT scanning services. The hospital is not a competitor in the market for the tied product. It receives no part of the fee for interpreting the scans. In this respect the case differs from Jefferson Parish where the hospital and the anesthesiologists shared the fees for anesthesiological services. See 466 U.S. at 6 n. 4, 104 S.Ct. at 1555 n. 4. The radiologists' performance of some services for the hospital without charge, such as reading some x-rays, is insufficient to demonstrate that the hospital has an economic interest in the interpretation of CT scans. The radiologists were furnishing these free services as an incident to their operation of the radiologist department before CT scans became available. The lack of the hospital's economic interest in the tied product is sufficient to defeat Dr. White's tying claim under either theory that he presses. See Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co., 758 F.2d 203, 207-08 (7th Cir.1985); Miller Motors v. Ford Motor Co., 252 F.2d 441, 446-47 (4th Cir.1958); ABA Antitrust Section, Antitrust Law Development, 75 (2d ed. 1984).
 
 IV
 
 30
 Dr. White alleges that the conspirators have monopolized, attempted to monopolize, and combined or conspired to monopolize the various markets for medical and surgical hospital services and CT scanning services in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2.
 
 
 31
 United States v. Grinnell, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966), contains the following definition:
 
 
 32
 The offense of monopoly under Sec. 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.
 
 
 33
 The relevant geographic market is Rockingham County. We agree with the district court that Dr. White cannot prevail on his claim of monopoly in the product market of medical and surgical hospital services because he is neither a provider nor consumer of these services. See Associated General Contractors v. Council of Carpenters, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983).
 
 
 34
 The remaining relevant product market as defined by Dr. White is CT scanning services. This market, however, must be considerably refined. Dr. White has no expertise in supervising or reading body scans. As a sole practitioner he is not in a position to furnish 24-hour emergency service for supervising head scans. In these respects he cannot compete with the radiologists who furnish these services. Moreover, Dr. White's complaint is based on the denial of his request to interpret his patients' head scans officially and charge for this service. Therefore, the relevant product market is the official interpretation of head scans. Neither Rockingham Hospital nor SSHS competes with Dr. White in interpreting head scans, and neither receives any part of the radiologists' fees for official interpretations. In part II we held that the hospital and SSHS did not conspire with the radiologists. One who does not compete in a product market or conspire with a competitor cannot be held liable as a monopolist in that market. See Ball Memorial Hospital v. Mutual Hospital Insurance, Inc., 1985-1 Trade Cas. (CCH) p 66,463 (S.D.Ind.1985).
 
 
 35
 Only the radiologists can be considered Dr. White's competitors in the market for official interpretation of head scans in Rockingham County. Although the radiologists are the only official interpreters in the county, they do not have monopoly power. The hospital's board, which unilaterally designated them, can relieve them of their position at any time. Therefore, the first element of Dr. White's claim of monopoly has not been satisfied. See Grinnell Corp., 384 U.S. at 570-71, 86 S.Ct. at 1703-04.
 
 
 36
 To satisfy the second element, the willful acquisition or maintenance of that power, Dr. White must show that a jury could find no valid business reason or concern for efficiency in the hospital's choice of the radiologists. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 2856-62, 86 L.Ed.2d 467 (1985).
 
 
 37
 Explaining its choice, Rockingham Memorial responded to an interrogatory in part as follows:
 
 
 38
 Rockingham Memorial believes that by making one group responsible and accountable to it, rather than having fragmented responsibility and accountability, it minimizes its malpractice exposure, can better monitor operations and quality control, helps to insure that a qualified physician is nearby and available if needed, and promotes efficiency in scheduling and promptness in reading. The CT scan interpretation becomes part of Rockingham Memorial's official and permanent record for the patient in question, and it believes that interpretation by the hospital-based radiologists is the best method of serving its interests and those of its patients.
 
 
 39
 While Dr. White resolutely contends that he can interpret head scans better than the radiologists, he offers no proof negating the hospital's concern for accountability, efficiency, and sound business practices. Nor is there evidence that the radiologists are incompetent to interpret the scans. Dr. White's contention that he would read the scans for a lesser fee than the radiologists does not address the question of payment for supervision over the scanning. Part of the fee the radiologists receive for official interpretations is for this service.
 
 
 40
 Finally, as Aspen Skiing points out, it is relevant to consider the impact of Dr. White's exclusion on consumers. See 105 S.Ct. at 2859. There is no evidence that would permit a jury to find that the interests of patients have been unnecessarily impaired by the restriction of competition between Dr. White and the radiologists.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 The district court's opinion is reported as White v. Rockingham Radiologists, Ltd., 1986-1 Trade Cas. (CCH) p 67,142
 
 
 [2]
 Dr. Canter wrote:
 The members of the Radiology Department sincerely regret the discomforture to all concerned precipitated by the General Staff Meeting last night.
 It is our position that the Radiology Department should be responsible for the performance and interpretation of the medical radiologic imaging procedures performed in our department. We will be very happy to work in consultation with you on any cases you so desire. We will be glad to set these cases aside until such time that they can be reviewed at your convenience and the convenience of the radiologist. The radiologist will charge for the conduct and interpretation of the examination.
 The above states our position. We await your early reply so that this matter can be resolved as promptly as possible.
 
 
 [3]
 The minutes of the meeting of the board disclose the following discussion:
 [C]oncerns were raised by Board members as to accountability, the potential liability of the Hospital for medical accidents resulting from lack of coordination or attention, the management difficulties of supervising fragmented responsibility, and whether it was appropriate to permit Dr. White to have a privilege of interpreting head scans when he was not prepared to assume the full responsibility for conducting the tests and for interpreting scans other than head scans. Board members also questioned whether it was appropriate to have the radiology group responsible for the head scan tests but another physician to have the opportunity for interpretation.