**STEPHEN JAY PHOTOGRAPHY, LTD.; Larry Lemasters, Individually and t/a Classic Studios; Robert G. Holman and Kitty L. Pugh, d/b/a Holman's Photography Studio, a general partnership, Plaintiffs–Appellants,**

v.

**OLAN MILLS, INC.; Kinder–Care, Inc., Defendants–Appellees.**

No. 89–2401.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1989.

Decided May 15, 1990.

Rehearing and Rehearing In Banc Denied June 21, 1990.

---

William P. Williams, Evans, Williams & Levinson, Virginia Beach, Va., for plaintiffs-appellants.

Walter D. Kelley, Jr., Willcox & Savage, P.C., William T. Prince, Williams, Worrell, Kelly, Greer & Frank, P.C., Norfolk, Va., for defendants-appellees.

Conrad M. Shumadine, Gary A. Bryant, Willcox & Savage, P.C., Richard M. Swope, Williams, Worrell, Kelly, Greer & Frank, P.C., on brief, Norfolk, Va., for defendants-appellees.

Before HALL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINS, Circuit Judge:

Stephen Jay Photography, Ltd., Larry LeMasters, Robert G. Holman, and Kitty L. Pugh (appellants) appeal the grant of summary judgment in favor of Olan Mills, Inc. and Kinder–Care, Inc. (appellees) on appellants' claims seeking damages and injunctive relief for alleged violations of the Virginia Antitrust Act, Va.Code Ann. §§ 59.1–9.1, *et seq.* (1987 & Supp.1989), and various federal antitrust laws. Appellants alleged that appellees made "commercial bribes," established a tying arrangement, and conspired with each other and with local high schools to monopolize and restrain trade in the high school yearbook and portrait photography markets. We affirm.

## I.

Appellants originally brought this action in Virginia state court alleging violations of Virginia antitrust laws. When appellees removed the action to federal district court pursuant to 28 U.S.C.A. § 1441 (West 1973 & Supp.1989), appellants amended their complaint to include allegations of violations of federal antitrust laws.

Appellants are commercial photographers operating in cities in the Norfolk, Virginia, area. Appellees are also commercial photographers who operate in the Norfolk area, but are large national corporations with corporate headquarters in other states. Appellees contracted with all 22 high schools in the Norfolk area to photograph students for school yearbooks, Olan Mills contracting with 20 percent of the schools and Kinder–Care with 80 percent. Appellees obtained the contracts through competitive negotiation, a process whereby school officials contacted photographers (including photographers other than appellees) whom they believed would be interested in obtaining yearbook contracts. After negotiation, appellees contracted to take student yearbook pictures and pay the schools a percentage of the profits they earned from sales of optional portrait photographs (portraits) of the students.[1] In exchange, the schools designated the contract photographer as the "official photographer," provided a location on school grounds where photographs could be taken, supplied a list of the students' names and addresses, and scheduled the students for their photographs.

While the students' yearbook pictures were being taken, appellees also took portraits.[2] Both the schools and appellees sent letters to the students and their parents encouraging the purchase of a portrait from the "official photographer." The letters disclosed that an unspecified portion of the portrait photograph price would be given to the school to support various school activities. This marketing system of coordinating the yearbook pictures and portraits, coupled with the endorsement of the school, gave appellees a competitive advantage in selling portraits.

Appellants found it difficult to implement a similar marketing strategy. While acknowledging that they objected to sharing the profits with the schools, they complain that their occasional calls expressing an interest in entering the negotiation process were ignored by school officials. They also claim that several schools discouraged students from submitting yearbook photographs taken by anyone other than "official photographers" by charging those students a nominal fee not exceeding $5 and that other schools failed to supply appellants with requested yearbook photograph specifications.

Appellants also claim that Olan Mills and Kinder–Care shared price information and charged similar prices for their portrait packages. In opposition to the motion for summary judgment, they submitted a letter written by an Olan Mills local representative to his home office which contained an enclosure listing the prices charged by Kinder–Care. Additionally, they established that a Kinder–Care price list was found in the confidential files of Olan Mills.

The four primary issues raised on appeal are whether the district court erred by granting summary judgment in favor of appellees on appellants' claims that (1) appellees established a tying arrangement in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp.1990); (2) appellees engaged in "commercial bribery" in violation of section 2(c) of the Robinson–Patman Act, 15 U.S.C.A. § 13(c) (West 1973); (3) appellees conspired with the high school officials and with each other to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1; and (4) appellees conspired with each other to monopolize the high school portrait and yearbook

---

1. Appellees agreed to pay the schools either 40 or 50 percent of their profits from portraits sold to underclassmen and 20 percent of their profits from portraits sold to seniors.

2. Typically, appellees took one to three exposures of each student. One of the exposures was selected by the student to go in the yearbook. The same or another exposure could be purchased as a portrait.

photography market in violation of section 2 of the Sherman Act, 15 U.S.C.A. § 2 (West Supp.1990).[3]

## II.

A tying arrangement constitutes a per se violation of the antitrust laws and occurs when one party agrees "to sell one product but only on the condition that the buyer also purchases a different (or tied) product...." *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Additionally, "two distinct markets for products that were distinguishable in the eyes of buyers" must be linked. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 19, 104 S.Ct. 1551, 1561, 80 L.Ed.2d 2 (1984). Appellants argue that appellees engineered an illegal tying arrangement by linking the sale of portraits (tied product) to the school yearbook photographs (tying product). They argue that the yearbook photographs and the portraits are separate and distinct products, that appellees possessed economic power in the high school yearbook photography market, and that appellees and the schools coerced the students into buying portraits through their solicitation letters.

■ The district court, relying on an affidavit which stated that in all cases the yearbook photographs were provided at no charge to the students, dismissed the claim holding that a "tying arrangement cannot exist when the tying product is not sold to the consumer, but is provided free of charge." *See Northern Pac. Ry.,* 356 U.S. at 5, 78 S.Ct. at 518; *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558. Although the record is unclear, we accept the contention

that it can be read to indicate that a nominal fee was charged by Kinder–Care to some senior students. We nevertheless agree with the result reached by the district court. For a tying arrangement violative of the antitrust laws to exist, the seller must coerce the buyer into purchasing the tied product. *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558. Typically, the coercion occurs when a monopolist seller "condition[s] [the] sale of one commodity on the purchase of another." *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). Here, unlike the typical tying arrangement, appellees did not condition the taking of yearbook photographs on the purchase of portraits. It was abundantly clear from the solicitation letters that the parents and students were under no obligation to purchase portraits. Because the students had the option to purchase portraits and their decision whether to purchase had no effect on their yearbook photographs, the relationship here did not constitute a tying arrangement.

## III.

Appellants contend that the payment of the profits from the portrait sales by appellees to the schools constitutes commercial bribery in violation of section 2(c) of the Robinson–Patman Act.[4] The issue of whether commercial bribery violates this section has not yet been addressed by this circuit.

The Robinson–Patman Act was enacted in 1936 to prohibit tactics used by large buyers or sellers to circumvent the discriminatory price prohibitions of the Clayton Act.[5] Congress determined that rather

---

**3.** Appellants also allege violations of the corresponding Virginia antitrust statute. Because the analysis under both state and federal law is substantially the same, we do not specifically address the state law claims.

**4.** Section 2(c) of the Robinson–Patman Act states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services ren-

dered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C.A. § 13(c).

**5.** The discriminatory price provisions of the Clayton Act, 15 U.S.C.A. §§ 12, *et seq.* (West 1973 & Supp.1990), were designed to eliminate

than forcing direct price concessions, which violated the Clayton Act, monopolists were insisting on indirect price concessions. One method employed to circumvent the Clayton Act was through the use of "dummy brokerages." For example, a large buyer with economic clout might insist that in order to do business sellers must pay a fee to a designated "broker." The broker would then turn the money over to the large buyer.

Although dummy brokerages were the chief target of section 2(c), it also covers other means by which brokerages could be used to effect price discrimination. *See FTC v. Henry Broch & Co.*, 363 U.S. 166, 168–69, 80 S.Ct. 1158, 1160–61, 4 L.Ed.2d 1124 (1960). In *Henry Broch & Co.* the Court noted, in dicta, that the legislative history of the Robinson–Patman Act supports the proposition that section 2(c) might also "proscribe other practices such as the 'bribing' of a seller's broker by the buyer." *Henry Broch & Co.*, 363 U.S. at 169–70 n. 6, 80 S.Ct. at 1160–61 n. 6. *See also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) ("bribery of a public purchasing agent" could violate section 2(c)) (dictum). The Senate Report discussing section 2(c) states in part:

> The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume.

S.Rep. No. 1502, 74th Cong., 2d Sess. 7 (1936). Four circuits have applied a commercial bribery analysis in section 2(c) cases.[6]

The Third Circuit, when considering allegations that a scheme of commercial bribery between an employee of a manufacturer and the manufacturer's sales agent constituted a violation of section 2(c), held that although the conduct was reprehensible, it did not come within the scope of the antitrust laws. *Seaboard Supply Co.*, 770 F.2d at 372. In so ruling the court stated: "In the appellate decisions which have found commercial bribery within the ambit of section 2(c) the common thread has been the passing of illegal payments from seller to buyer or vice versa." *Id.* The court reasoned that by restricting liability to situations "when the seller-buyer line has been passed," courts have narrowed the scope of section 2(c) and upheld Congress' intent to leave the relationships of legitimate brokerages unaffected by section 2(c). *Id.*

■ Appellants contend that the "seller-buyer line" *was* crossed here because the schools acted as intermediaries in behalf of the students when they contracted to have appellees take the yearbook pictures. Thus, the issue is whether, as a matter of law, the payments made from appellees to the schools from profits on *portrait sales* crossed the seller-buyer line. In other words, was the school an intermediary acting in behalf of the students (the buyers) when the portrait sales were made to them by the appellees (the sellers)? The legislative history and the cases which address commercial bribery under section 2(c) are helpful in determining the answer.

Discussing the commercial bribery aspect of section 2(c), the Court in *Henry Broch & Co.*, 363 U.S. at 169–70 n. 6, 80 S.Ct. at 1160–61 n. 6, cited portions of two statements from the Congressional Record

the competitive advantage large buyers and sellers attained over their smaller competitors by virtue of their economic clout and bargaining power.

**6.** *See Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir.1988), *aff'd on other grounds,* — U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Grace v. E.J. Kozin Co.*, 538 F.2d 170 (7th Cir.1976), *abrogation on other grounds recognized, Federal Paper Bd. Co.*

*v. Amata,* 693 F.Supp. 1376 (D.Conn.1988); *Rangen, Inc. v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851 (9th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); *Fitch v. Kentucky–Tennessee Light & Power,* 136 F.2d 12 (6th Cir.1943). *But see Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371–72 (3d Cir.1985) (questioning the proposition that Congress intended to include commercial bribery within the ambit of section 2(c)).

to support the proposition that Congress intended to bring commercial bribery within the ambit of section 2(c):

> A practice has grown up whereby large mass buyers bribe representatives of the seller, oftentimes the seller representing groups of farmers, under the guise of a brokerage allowance. It is not a brokerage allowance at all; it is a bribe. This bill will not compel the use of a broker but it will prohibit one party from bribing the representative of the other under the guise of brokerage allowances or commissions.

74 Cong.Rec. 7759–60 (1936) (statement of Sen. Patman). The second statement cited by the Court reads:

> There is a merchant in Virginia representing potato growers. He sells thousands of cars of potatoes a year, and our investigation has disclosed that he had a secret contract with a large mass corporate chain buyer by which he obligated himself to sell every car of those potatoes of those farmers to this large buyer.... This man representing the farmers sold those potatoes to that mass buyer, fixing the price himself, and what did he get out of it? He got a secret rebate of $2.50 to $5 on every car that the farmers knew nothing about.... That is the kind of dummy-brokerage arrangement we are trying to prohibit in this bill.

74 Cong.Rec. 8111–12 (1936) (statement of Sen. Patman). These statements refer to the corruption of an agency relationship. In Senator Patman's example the farmers' representative had the actual authority to bind the farmers in the sale of potatoes. Here, the schools did not have the authority to bind the students to purchase portraits. Instead the students were free to purchase portraits from appellees or from a photographer of their choice, or to purchase no portraits from anyone.

In harmony with these examples from the Congressional Record, circuit court cases finding commercial bribery in violation of section 2(c) all involve the corruption of an agency or employment relationship. *See E.J. Kozin Co.*, 538 F.2d 170 (sales manager and executive vice president of buyer received payments from seller to facilitate sales); *Rangen, Inc.*, 351 F.2d 851 (fish food seller bribed a state official so that the official, who was responsible for the nutritional value of fish food, would use his expertise to influence state purchasing officials to buy the seller's fish food); *Fitch*, 136 F.2d 12 (holding that a coal company which paid bribes to the president of a power company, for his personal use, to obtain sales of coal to the power company, was guilty of commercial bribery in violation of section 2(c)). Unlike these relationships, the relationship between the students and the schools does not rise to one akin to that of agency or employment. Without such a relationship to connect the students' purchasing decisions to the schools, the payments from the appellees to the schools do not cross the seller-buyer line.

Therefore, even assuming section 2(c) proscribes commercial bribery, we conclude that no violation occurred here. Unquestionably, the schools and the students enjoy a special relationship of trust. And it is true that the schools arranged to have yearbook photographs taken by appellees and encouraged students to purchase portraits from them. However, letters encouraging the students to purchase these photographs either expressly or implicitly indicated that their decision to purchase portraits was optional. From this correspondence it is abundantly clear that the schools did not assume a position resembling that of a portrait purchasing agent for the students.[7]

---

7. Appellants contend that under Va.Code Ann. § 11–41(G) (1989) the schools represent "purchasing agents" for the students. Section 11–41(G) authorizes public schools to enter contracts providing that photographs "will be available for purchase ... by students." Because the words "will be available" imply that the students will not be obligated to purchase the photographs, we do not believe this provision sup-

ports an allegation that the schools act as purchasing agents.

Appellants also cite two opinions of the Virginia Attorney General, which rely on federal court decisions interpreting section 2(c) of the Robinson–Patman Act to interpret section 59.1–9.7(c) of the Virginia Code, a provision similar to section 2(c). In both opinions the Attorney

## IV.

Appellants also claim that appellees conspired with each other and with the schools to restrain trade in violation of section 1 of the Sherman Act which makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade...." 15 U.S.C.A. § 1.

Concerted activity is an essential element of a section 1 claim. *Terry's Floor Fashions, Inc. v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir.1985). To survive a motion for summary judgment in an antitrust conspiracy case, a plaintiff must establish that there is a genuine issue of fact whether the defendant entered into an illegal conspiracy. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not itself support an inference of antitrust conspiracy." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 102 (4th Cir.1987). A plaintiff must "present direct or circumstantial evidence that reasonably tends to prove that the [conspirators] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). In other words, the evidence must tend to exclude the possibility of independent action by the alleged conspirators. *Id.*

■ The district court concluded that the appellants' affidavits were insufficient to raise a genuine factual issue of whether the schools and appellees " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *See id.*

Appellants argue the district court erred because documentary and testimonial evidence in the record creates such an issue.

Appellants first point to their deposition testimony. All of the appellants stated that they were excluded from the competitive negotiation process. The testimony of appellants Holman and Pugh reveals, however, that neither made any effort to become an official photographer. Stephen J. Friedman, president of appellant Stephen Jay Photography, Ltd., stated that he obtained the information needed to submit a bid but chose not to because he objected to paying a percentage of his profits to the schools. Appellant LeMasters testified that he talked with two high school principals about becoming an official photographer. LeMasters spoke to the first principal once and did not specifically request to be included in the negotiation process at his school. He spoke with the second principal about entering the process "probably two or three" times over a three-year period. We agree with the district court that LeMasters' unsuccessful attempts to enter the bidding process at one or two of the schools is insufficient to support an inference that the schools and appellees entered into a common scheme to exclude appellants from the competitive negotiation process. Additionally, appellants have articulated no motive the schools might have to engage in such a conspiracy. Indeed, logically the converse is true because the schools benefit when photographers aggressively compete for contracts. "[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. at 1356.

General concludes that the schools act as representatives of the students in connection with portrait photograph sales. *See* 1982–1983 Op. Att'y Gen. 411; 1976–1977 Op.Att'y Gen. 229. The district court agreed with the Attorney General on this point. Because we do not agree that such a conclusion is compelled under federal law, we decline to follow these opinions.

Additionally, because section 59.1–9.17 states that the Virginia Antitrust Act "shall be applied and construed ... in harmony with judicial interpretation of comparable federal statutory provisions," we believe that the Supreme Court of Virginia would conclude that appellees did not violate section 59.1–9.7(c).

■ Appellants next refer to the facts that the schools designated appellees as their official photographers, wrote letters on their behalf or granted them free advertising in the yearbook, and that appellees provided faculty members with reduced-price or free portraits. These acts, however, were all taken by the schools or appellees pursuant to their contractual responsibilities. Although appellants alleged in their complaint that the "exclusive dealing contracts" between the schools and appellees violated section 1 of the Sherman Act, they neither explained to the district court how the contracts operated to restrain trade nor stressed this point on appeal. It follows that actions taken by the appellees and the schools pursuant to valid contractual agreements are readily explainable as legitimate acts consistent with their contractual responsibilities. *See Rockingham Radiologists, Ltd.,* 820 F.2d at 102; *cf. Ryko Mfg. v. Eden Servs.,* 823 F.2d 1215, 1227–29 (8th Cir.1987) (distributor's contractual duties to solicit and accept purchase orders do not transform customer agreements into conspiracies to fix prices), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

Appellants further contend that schools caused or induced students to boycott them by refusing to accept yearbook photographs taken by appellants. In support of this contention, appellants cite to a portion of the deposition testimony of James B. Slaughter, the principal of Maury High School. However, instead of supporting appellants' contention, Slaughter's testimony clearly indicates that the school did accept photographs other than those taken by the official photographer. Appellants also contend that schools charged a fee to students who submitted a photograph not taken by the official photographer, allegedly to discourage students from this practice. However, the record reveals that this was merely a processing fee charged by the yearbook publishing company. Additionally, appellants assert that it was difficult to obtain specifications for yearbook photographs from some schools and one refused to accept a paid advertisement for the yearbook from one of appellants. Though these facts are supported by the record, no evidence links this behavior to an agreement with appellees.

Viewing the evidence *in toto* and in the light most favorable to appellants we agree with the district court that the evidence is insufficient "for a jury to return a verdict" for appellants, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and thus there is no genuine factual issue about whether appellees entered into a conspiracy to restrain trade with the schools. The fact that some schools were less than cooperative with appellants is insufficient to satisfy appellants' burden. *See Rockingham Radiologists,* 820 F.2d at 102.

V.

Appellants further contend that Olan Mills and Kinder–Care conspired with each other to illegally fix prices for high school student portraits and to divide the market horizontally to minimize competition in violation of section 1 of the Sherman Act. Additionally, they contend that appellees conspired to monopolize the high school student portrait market in violation of section 2 of the Sherman Act.

Both price fixing agreements and agreements to horizontally divide a market to restrain competition are per se violations of section 1 of the Sherman Act. *See United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (horizontal territorial division); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); *see also Northern Pac. Ry.,* 356 U.S. at 5, 78 S.Ct. at 518 (noting that price fixing or market division agreements are conclusively presumed unreasonable and are unlawful).

To support their contention that Olan Mills and Kinder–Care agreed to fix prices, appellants primarily rely on the fact that a Kinder–Care price list was found in the files of Olan Mills. Furthermore, they emphasize that the prices charged by appellees were virtually identical. They point to *United States v. Container Corp.,* where

there was an agreement between competitors to exchange price information.[8] *United States v. Container Corp.*, 393 U.S. 333, 334–45, 89 S.Ct. 510, 511–16, 21 L.Ed.2d 526 (1969). In *Container Corp.* a divided Court held that an agreement to exchange current price information upon request violated the Sherman Act.

■ The record before us does not support an inference that appellees agreed to share price information. The fact that the price information about one company is found in a competitor's files or an employee reports a competitor's pricing policy to his home office and the two companies charge similar prices for their products, without more, cannot support an inference that the two competitors entered into an agreement to share prices. To successfully raise an inference that two competitors agreed to share price information, a complainant must produce some evidence which tends to exclude the possibility that the competitors acted independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470–71. Here, the record supports only the conclusion that there was no agreement, informal or otherwise, to exchange price information and Olan Mills obtained the price list without the knowledge or approval of Kinder–Care.[9]

Appellants also allege that appellees conspired to restrain trade by dividing the relevant market area horizontally. However, neither in the district court nor on appeal did appellants offer any support for this allegation. Nor has our independent review of the record produced any basis of support. Consequently, we summarily affirm the grant of summary judgment for appellees on this claim.

■ Appellants also allege that appellees violated section 2 by conspiring to monopolize the Norfolk area high school yearbook photography market. While they concede that a conspiracy to monopolize claim re-

quires proof of conspiracy, they rely almost entirely on the evidence introduced to demonstrate a conspiracy to restrain trade. As previously stated, we find this evidence insufficient to overcome their burden under *Monsanto*.

Appellants also point to the fact that appellees have monopolized the high school portrait market by obtaining contracts for all 22 of the local high schools. However, as pointed out by the district court, without evidence of a conspiracy to monopolize, no violation of section 2 can occur. *See Rockingham Radiologists*, 820 F.2d at 104 ("One who does not ... conspire with a competitor cannot be held liable as a monopolist in that market.").

Based on the foregoing, we affirm the summary judgment granted by the district court in favor of appellees.

AFFIRMED.

---

8. An agreement to adhere to a price schedule would constitute a per se violation of section 1. *See Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811; *Sugar Inst. v. United States*, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936).

9. When asked in his deposition how Olan Mills obtained the Kinder–Care price list, the Olan Mills local representative stated that he got the list from his son who attends a local high school.