UNITED STATES of America

v.

NATIONAL FINANCIAL SERVICES, INC., Robert J. Smith, and N. Frank Lanocha.

Civ. No. L–91–226.

United States District Court, D. Maryland.

Jan. 8, 1993.

Jacqueline H. Eagle, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, for plaintiff.

Gerard P. Martin, Matthew S. Sturtz, Miles & Stockbridge, Baltimore, MD, for defendants.

## MEMORANDUM

BLAKE, United States Magistrate Judge.

The United States of America filed this action against National Financial Services (N.F.S.), Robert J. Smith (Smith), and N. Frank Lanocha (Lanocha), alleging that defendants' collection activities violated the Fair Debt Collection Practices Act, 15 U.S.C. section 1692 *et seq.* (FDCPA). This case has been referred to the undersigned magistrate judge by consent of the parties for final disposition, pursuant to 28 U.S.C. section 636(c) and Local Rule 301. Now pending before me are the parties' cross-motions for summary judgment. For the following reasons, the defendants' motions will be denied and the government's motion will be granted in part and denied in part.

In 1983, American Family Publishers (AFP), a magazine subscription company, began turning over its delinquent accounts to N.F.S., a collection agency owned by Smith, for debt collection. (Deposition of Robert J. Smith, at 3, 6).[1] Upon receiving these accounts, N.F.S. would send each debtor a collection letter, written by Smith, demanding payment of the debt.[2] (*Id.* at 9; *Government's Memorandum of Points and Authorities in Support of Its Motion for Partial Summary Judgment,* Exhibit 1). If the letter failed to exact payment as demanded, more were sent.[3] (Deposition of Robert Smith, at 70). If, following this wave of notices, the debtor still refused to pay, N.F.S. would then turn the account over to Lanocha, an attorney, for collection.[4] (*Id.* at

---

1. To turn its accounts over to N.F.S., AFP would forward a set of computer tapes containing the name and address of each debtor, as well as the amount of the debt. These tapes, which contained anywhere from 5,000 to 70,000 accounts, have been sent every few weeks for the past eight years. (*Government's Memorandum,* Exhibit 5, at 2; Deposition of Robert J. Smith, at 8–9).

2. To create these letters, N.F.S. would feed the computer tapes sent by AFP into its computer. The information contained on the tapes would then be merged with the text prepared by Smith to produce a series of debt collection or "dunning" letters. (Deposition of Robert J. Smith, at 8–9, 11, 69).

3. According to Smith, N.F.S. did not have a cutoff point with respect to the number of letters it would send to any given debtor. (Deposition of Robert Smith, at 70). Any debtor who disputed the amount owed, however, was removed from the system and had his account canceled. (Smith Affid. at ¶ 10).

4. Shortly after AFP began turning its accounts over to N.F.S. for collection, AFP expressed interest in using an attorney to assist with collection efforts. As a result of this expressed interest, Smith put AFP in touch with Lanocha, who then worked out a separate agreement with AFP. According to this agreement, Lanocha would receive half of every debt he collected on AFP's

71; Deposition of N. Frank Lanocha, at 98, 111, 114). Lanocha, with the help of N.F.S. computers,[5] would then send out collection letters, advising AFP debtors that he represented American Family and had the authority to institute suit against them if they did not settle their accounts. (Deposition of N. Frank Lanocha, at 60, 62–66, 73–75; *Government's Memorandum*, Exhibits 2 & 3). While discussions concerning the institution of legal proceedings against AFP debtors had occurred between Lanocha and AFP,[6] no actual suits were filed after 1984.[7] (Deposition of N. Frank Lanocha, at 46–52, 55; *Government's Memorandum*, Exhibit 5 at 3).

In 1985, the Federal Trade Commission (FTC) began investigating Smith, N.F.S. and Lanocha for possible violations of the Fair Debt Collection Practices Act, 15 U.S.C. section 1692 *et seq.* (FDCPA). (Defendants Lanocha, N.F.S. and Smith's *Memorandum in Support of Motion for Summary Judgment*, at 1). On February 1, 1991, the United States filed suit against the defendants, alleging violations of sections 1692e(5), 1692e(10), and 1692g of the FDCPA related to letters used during 1986–1992. (*Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment*, at 1; *Government's Memorandum*, at 1–2). On October 9, 1991, the defendants moved for summary judgment. The government opposed and filed its own motion for partial summary judgment on October 28, 1991. The government's motion was followed by a response from the defendants on November 25, 1991, which, in turn, was followed by a reply from the government on December 12, 1991. The case was referred to the undersigned judge on September 3, 1992.

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As stated by the Supreme Court, this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

Moreover, the Supreme Court has explained that the Rule 56(c) standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a): " ... there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 249, 106 S.Ct. at 2510; *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir.1988). Further, the court has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves–*

---

behalf. (Deposition of Robert J. Smith, at 36–40; Deposition of Frank Lanocha, at 23–34).

**5.** To create his collection letters, Lanocha would give Smith a copy of the text he desired to use. Smith would then input the text into N.F.S.'s computer, merge it with the list of debtors derived from AFP's tapes and mail the resultant letters. Lanocha, in return, reimbursed Smith for any production costs. (Deposition of Lanocha, at 73–77, 80–83).

**6.** Discussions regarding the institution of lawsuits against AFP debtors also occurred between N.F.S. and AFP. (Deposition of Robert J. Smith, at 48–58).

**7.** Lanocha did file suit against fifteen debtors in 1984. He could not recall, however, if that action was successful in bringing about payment. (*Government's Memorandum*, Exhibit 5 at 3; Deposition of Frank Lanocha, at 126).

*Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987), *citing, Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

As noted above, the subjects of summary judgment in this case concern alleged violations of sections 1692e(5), 1692e(10) and 1692g of the FDCPA. In pertinent part, section 1692e(5) and e(10) provide:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: ... (5) The threat to take any action that ... is not intended to be taken....[8]

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

■ In determining whether a violation of 1692e(5) has been proved, two steps must be followed. First, the language of the notice must be evaluated to determine what action is threatened. Second, it must be determined whether the debt collector who sent the notice intended to take the threatened action. *Jeter v. Credit Bureau,* 760 F.2d 1168, 1176 (11th Cir.1985); *United States v. ACB Sales & Service, Inc.,* 590 F.Supp. 561, 570 (D.Ariz.1984). *See also Swanson v. Southern Oregon Credit Service, Inc.,* 869 F.2d 1222, 1226–27 (9th Cir.1988). In applying the first prong of this analysis, courts differ on whether the meaning of the language in the notice should be evaluated under a "reasonable juror"/"average debtor" standard or a "least sophisticated debtor" standard. In *Jeter,* the court held that "the sophistication, or lack thereof, of the consumer is irrelevant to whether [the debt collector] 'threat[ened] to take any action ... that [was] not intended to be taken.'" 760 F.2d at 1175. Finding that conflicting inferences could be drawn from the letters at issue, *Jeter* directed that threatened action be interpreted by a "reasonable jury." *See also ACB,* 590 F.Supp. at 571 ("average debtor"); *Blackwell v. Professional Business Services,*

526 F.Supp. 535, 538 (N.D.Ga.1981) ("reasonable consumer" standard applied to all violations of § 1692 et seq.). The Ninth Circuit, however, at least as to violations of 1692e(5) resulting from a threat to take action that could not legally be taken, has held that the threat should be evaluated under the least sophisticated debtor standard, because "[o]therwise, a debt collector could couch threatened action in language that misleads some debtors as to what the debt collector could legally do." *Swanson,* 869 F.2d at 1227. Further, the least sophisticated debtor standard was applied to a 1692e(5) intent violation in *United States v. CAB,* 667 F.Supp. 370, 378 (N.D.Tex.1986).

■ I find it most consistent with the purposes of the Act, as discussed in *Jeter,* 760 F.2d at 1172–75, to use the least sophisticated consumer standard in evaluating all violations of § 1692e(5). Otherwise, a consumer could be misled as to the debt collector's intentions yet deprived of the Act's protection against threats of unintended action. I would find the same violations noted below, however, under either a "least sophisticated" or a "reasonable consumer" standard.

■ The *Jeter* court does apply the least sophisticated debtor standard in resolving alleged violations of 1692e(10). Whether a particular representation or means of collection is deceptive is to be judged in terms of its tendency to mislead the least sophisticated recipient of the debt collector's letters. *Jeter,* 760 F.2d at 1175; *see also Riveria v. MAB Collections, Inc.,* 682 F.Supp. 174, 178 (W.D.N.Y.1988); *but see Blackwell,* 526 F.Supp. at 538. I will apply the least sophisticated debtor standard to the 1692e(10) violations alleged in this case.

With respect to violations under section 1692g, a different set of criteria applies. Under the terms of this section, a collector must, either in its initial communication or within five days of its initial communication, provide a consumer with the following information: (1) the amount of the debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that the collector may presume the debt to be valid if the debtor

---

**8.** Section 1692e(5) also prohibits a "threat to take any action that cannot legally be taken...."

does not dispute the debt, or any portion of it, within thirty days of receiving notice; (4) a statement that verification of the debt will be provided, if requested in writing within thirty days of receiving notice; and (5) a statement that the collector will provide the consumer with the name and address of the original creditor, if requested in writing within thirty days of receiving notice. 15 U.S.C. section 1692g(a)(1)–(5). If the debtor requests either verification of the debt, or the name and address of the original creditor, all collection efforts must cease until the collector provides the debtor with the requested information. 15 U.S.C. 1692g(b). *See also Miller v. Payco–General American Credits, Inc.*, 943 F.2d 482, 483 (4th Cir.1991); *Dorsey v. Morgan*, 760 F.Supp. 509, 514 (D.Md. 1991).

■ In evaluating alleged violations under section 1692g, this Circuit has concluded that mere "technical compliance" with the section's provisions does not constitute sufficient notice; *Miller*, 943 F.2d at 485; to comply with the requirements of section 1692g, " 'the notice ... must be conveyed effectively to the debtor ... [and] not be overshadowed or contradicted by other messages or notices appearing in the initial communication from the collection agency.' " *Id.*, at 484, *quoting Swanson*, 869 F.2d at 1225. Whether the notice is effective must be judged from the point of view of the least sophisticated consumer. *Swanson*, 869 F.2d at 1225; *Baker v. G.C. Services Corp.*, 677 F.2d 775, 778 (9th Cir.1982).

Turning first to the alleged violations of section 1692e(5), the documents at issue will be evaluated with respect to: (1) whether the least sophisticated debtor would believe the documents threatened legal action; and (2) whether the defendants N.F.S., Smith, and Lanocha intended to take legal action.

Applying the first prong of this standard to N.F.S.'s collection notices (*Government's Memorandum*, Exhibit 1),[9] I find that a reasonable as well as a least sophisticated debtor would perceive these notices as threatening legal action. The language, "YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE," implies that the account will receive different treatment from an attorney than it did from N.F.S.;[10] since the primary difference between a collection agency and an attorney, in the eyes of the debtor, is the latter's ability to sue, it follows that the difference in treatment would be the institution of suit. Similarly, the language, "Remember *your* attorney will want to be paid," (emphasis added) suggests that the debtor will be in need of an attorney to defend against a debt collection action should he or she fail to meet the payment deadline.[11]

Having determined that N.F.S.'s collection letters do threaten the debtor with legal action, the next inquiry to be made is whether N.F.S. and Smith intended to file suit against AFP debtors at the time these no-

---

**9.** Exhibit 1, a "DEADLINE NOTICE" dated January 26, 1990, states (as to a balance of $21.92) that the deadline is February 5, 1990 and:

it is now being processed by our NATIONWIDE COLLECTION AGENCY DIVISION to enforce IMMEDIATE PAYMENT from you. Notification is hereby given that the date assigned above is your DEADLINE.

If you fail to pay your bill by the DEADLINE, we will then take the appropriate action. Remember, your attorney will also want to be paid. An envelope is enclosed for your payment.

Our AUDIOTEX telecommunications system remains on line to answer your inquiry, twenty-four hours per day, seven days per week. Call anytime (301) 366–3217.

YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE!!!

**10.** From a practical point of view, there would be no significance behind the failure to pay unless some difference in treatment would result; if a debtor who is otherwise unaffected by collection notices from both AFP and N.F.S. is going to be motivated to pay the outstanding debt, he or she must be made to believe that a transfer of the account to an attorney will result in the institution of suit, rather than the continued receipt of collection letters.

**11.** Indeed, the insertion of the above-stated language does not make any sense unless a lawsuit is implicitly being threatened; there is no reason to mention that "your attorney will want to be paid" unless failure to comply with payment demands will result in an action against the debtor.

tices were sent. Based on the information before me, it appears that N.F.S. did not intend to file suit against AFP debtors at the time these notices were sent. It did not have any "internal procedure .. [for] get[ting] authorization to sue the debtor after sending the letter;" *ACB*, 590 F.Supp. at 572; in fact, N.F.S. repeatedly conveyed its belief in the impracticability of filing suit when pressed by AFP to do so. (Deposition of Robert J. Smith, at 48–50, 53–58). Even if some discussion concerning the possible institution of suit by N.F.S. did take place, the discussion centered more on the mechanics of instituting suit against AFP debtors in general, not upon the merits of filing suit against any debtor in particular. (*Id.*, at 51–52). In light of these facts, I conclude that N.F.S.'s collection notices violate section 1692e(5) of the FDCPA. *See Pipiles v. Credit Bureau*, 886 F.2d 22, 25–26 (2d Cir.1989); *Baker*, 677 F.2d at 778–79.

The other letters in dispute were sent on the letterhead of attorney Lanocha.. In 1986, the FDCPA was amended to delete the exemption for attorneys initially applicable to the definition of debt collection under 15 U.S.C. § 1692a(6). Congress found that the attorney exemption permitted numerous continuing abuses, including " 'threats of legal action on small debts where there is little likelihood that legal action will be taken.' " *Crossley v. Lieberman*, 868 F.2d 566, 570 (3rd Cir.1989), *quoting* H.Rep. No. 405, 99th Cong.2d Sess. (1985), U.S.Code Cong. & Admin.News 1986, p. 1752. As noted by the Third Circuit:

> Abuses by attorney debt collectors are more egregious than those of lay collectors because a consumer reacts with far more

duress to an attorney's improper threat of legal action than to a debt collection agency committing the same practice. A debt collection letter on an attorney's letterhead conveys authority and credibility.

868 F.2d at 570. *See also CAB*, 667 F.Supp. at 379–381.

When viewed through the eyes of either a least sophisticated debtor or a reasonable consumer, Lanocha's letters also appear to threaten legal action. The statement, ". . . I will be compelled to consider the use of the *legal remedies* that may be available to effect collection" (*Government's Memorandum*, Exhibit 2) [12] (emphasis added),. clearly implies that suit will be filed; to interpret it any other way would reduce it to nothing more than a threat to continue sending collection letters. Considering the ineffectiveness of previous collection letters, such a threat would hardly be worth making. If the debtor (who, at this point, has ignored all previous collection attempts) is going to be motivated to pay, he or she must interpret this statement as a threat by an attorney to file suit.

The threat of legal action becomes even more apparent when the statement is read in conjunction with the letter's other language. As seen through the eyes of the debtor, the statements, "I AM THE COLLECTION ATTORNEY WHO REPRESENTS AMERICAN FAMILY PUBLISHERS" and "I HAVE THE AUTHORITY TO SEE THAT SUIT IS FILED AGAINST YOU IN THIS MATTER," (*Government's Memorandum*, Exhibit 2) signify that the "legal remed[y]" under consideration is the institution of suit.

Similarly, the statement in Exhibit 4A,[13] "ONLY YOUR IMMEDIATE PAYMENT

---

**12.** Exhibit 2, a letter dated July 29, 1986, states (as to a balance of $9.97):

> PLEASE NOTE ... I AM THE COLLECTION ATTORNEY WHO REPRESENTS AMERICAN FAMILY PUBLISHERS. I HAVE THE AUTHORITY TO SEE THAT SUIT IS FILED AGAINST YOU IN THIS MATTER. IF THERE IS ANY REASON WHY YOU ARE NOT PAYING THIS BALANCE DUE, WRITE SAME ON THE BACK OF THIS NOTICE. Immediate payment is required of the above entitled account which has been assigned to this office for collection. It is readily apparent that your obligation is quite clear.

> Unless this payment is received in this office within five days of the date of this notice, I will be compelled to consider the use of the legal remedies that may be available to effect collection.
>
> Therefore, I expect your immediate payment thereby avoiding this possibility and permitting me to consider this matter closed.

**13.** Exhibit 4 contains copies of two different letters. For ease of reference, the letter at the top of the page will be referred to as Exhibit 4A, while the letter towards the bottom of the page will be referred to as Exhibit 4B.

WILL STOP FURTHER LEGAL ACTION," (*Government's Memorandum*, Exhibit 4A) [14] also threatens the debtor with suit; indeed, from the standpoint of the debtor, there is no other "action" left to take. Two different sources have already sent collection letters; the account has been turned over to an attorney, as forewarned; the attorney has made a demand for payment; the only "legal action" left is the filing of suit.

Exhibit 3 [15] also threatens legal action to obtain and collect judgments. Exhibit 4B, [16] while somewhat confusing, states that either: 1) the account will be sold and the buyer may file suit, or 2) acting on "instructions," attorney Lanocha will "take any action, that is legal, to enforce payment. . . ." This also threatens the consumer with a lawsuit.

Having decided that these letters threaten legal action, the next matter to be considered is whether Lanocha intended to sue these debtors at the time he sent the letters. From a review of the evidence before me, it appears that Lanocha did not intend to sue AFP debtors. At the time of the present action, he had not filed suit against an AFP debtor in almost seven years. [17] (Deposition of N. Frank Lanocha, at 46–52, 55; *Government's Memorandum*, Exhibit 5 at 3). While Lanocha had discussed the possibility of filing suit with Steve McCarthy, his discussions, like those of N.F.S., focused more on how to assemble a large-scale system for filing suit than on deciding which accounts warranted legal action. [18] (Deposition of N. Frank Lanocha, at 47, 51–52). To the extent that Lanocha did investigate the feasibility of filing suit against all AFP debtors, he concluded that it would be too "burdensome" a plan to enact. (*Id.*, at 50–52). In light of this evidence, I conclude that Exhibits 2, 3, 4A and 4B, like Exhibit 1, violate section 1692e(5) of the FDCPA.

■ Turning next to the alleged violations of section 1692e(10), I find that the least sophisticated debtor would be deceived by the NFS collection notice. As discussed above, the language, "YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE," (*Government's Memo-*

14. Exhibit 4A, a letter dated April 3, 1990, states (as to a balance of $11.97):
LAW OFFICES—DEMAND NOTICE
YOU HAVE TEN DAYS TO PAY YOUR BILL IN FULL. CONTINUED FAILURE TO PAY WILL RESULT IN FURTHER COLLECTION ACTIVITY.
ONLY YOUR IMMEDIATE PAYMENT WILL STOP FURTHER LEGAL ACTION. AN ENVELOPE IS ENCLOSED.

15. Exhibit 3, a letter dated July 13, 1987, states (as to a balance of $7.57):
I AM THE ATTORNEY HIRED BY AMERICAN FAMILY PUBLISHERS TO PROTECT THEIR INTERESTS IN THE UNITED STATES. I HAVE FILED SUITS AND OBTAINED JUDGMENTS ON SMALL BALANCE ACCOUNTS JUST LIKE YOURS.
MY AUTHORITY TO COLLECT THESE ACCOUNTS INCLUDES THE ENFORCEMENT OF JUDGMENTS WHEN RECEIVED AND DOCKETED OR, I CAN FORWARD YOUR ACCOUNT TO A COLLECTION AGENCY.
REMIT YOUR PAYMENT IN FULL TO ME IN THE ENCLOSED ENVELOPE SO THAT I MAY CLOSE YOUR DELINQUENT ACCOUNT.

16. Exhibit 4B, a letter dated September 7, 1990, states (as to a balance of $26.92):
YOUR ACCOUNT MAY NOW BE FOR SALE NOW AFP HAS TWO TYPES OF ACCOUNTS TYPE ONE: ACCOUNTS, LIKE YOURS, THAT ARE SOLD. THEY RUN THE RISK THAT THE BUYER WILL FILE SUIT AGAINST THEM. JUDGMENT CAN RESULT IN ASSETS BEING SEIZED.
TYPE TWO: ACCOUNTS THAT ARE NOT SOLD. THEY WILL RECEIVE PROGRESSIVELY AGGRESSIVE COLLECTION EFFORTS. INSTRUCTIONS HAVE BEEN GIVEN TO TAKE ANY ACTION, THAT IS LEGAL, TO ENFORCE PAYMENT FROM THEM.
MY OFFICE IS PREPARED TO HANDLE EITHER TYPE OF ACCOUNT. THE DECISION TO AVOID BEING TYPE ONE OR TYPE TWO IS YOURS. SIMPLY PAY YOUR BILL NOW.

17. Although he filed suit against 15 AFP debtors in 1984, Lanocha could not recall how many of these debtors paid as a result of judgment being assessed against them. He did recall, however, that he did not institute any post-judgment collection proceedings against those who did not pay. (Deposition of N. Frank Lanocha, at 126).

18. As Lanocha himself indicated, ". . . it was a mechanical thing. We . . . my office, didn't intend to file suits in all these states. I intended to forward them out to other lawyers in other states for them to file suit on." (Deposition of Frank Lanocha, at 51). Thus, at the time Lanocha sent out his letters, he did not have any intention of personally filing suit against AFP debtors.

*randum*, Exhibit 1), threatens a debtor with legal action; since N.F.S. did not actually intend to sue AFP debtors, the statement can only be read as a false threat to recommend legal action. Similarly, the statement, "*Your* attorney will want to be paid," (emphasis added) dupes the consumer into believing an attorney will be needed to defend an action for nonpayment when, in fact, no such action will be taken. Accordingly, the N.F.S. collection notice violates section 1692e(10) of the FDCPA.

The same finding applies to the Lanocha letters. Statements such as "ONLY IMMEDIATE PAYMENT WILL STOP FURTHER LEGAL ACTION," (*Government's Memorandum*, Exhibit 4A) written on the letterhead of an attorney, represent to the consumer that nonpayment will result in a lawsuit, when, in fact, Lanocha had no intention of filing suit against any AFP debtor.[19] Similarly, the statements, "I AM THE COLLECTION ATTORNEY WHO REPRESENTS AMERICAN FAMILY PUBLISHERS," and "I HAVE THE AUTHORITY TO SEE THAT SUIT IS FILED AGAINST YOU IN THIS MATTER," (*Government's Memorandum*, Exhibit 2) "falsely suggest to the least sophisticated consumer that an attorney has been retained to collect his or her

---

**19.** *See* discussion of e(5) violations, *supra*, at 235–36.

**20.** As envisioned by Lanocha, the "system" for instituting suit against AFP debtors would have been a "mechanical" one, apparently operated along the same lines as the dunning letters. Given that selection under this system would, in essence, be random, Lanocha cannot successfully maintain that he would be responsible for the decision to authorize suit against any *particular* debtor. (Deposition of Lanocha, at 50–52; *see also Lanocha Memorandum in Support of Summary Judgment*, Exhibit G).

**21.** Defendants Smith and N.F.S. assert that the adequacy of their notice has already been adjudicated and that summary judgment with respect to this issue should be granted on res judicata grounds. (*Smith and N.F.S. Memorandum*, at 18–19). *See In re Robert Smith, et al.*, P.S. Docket No. 34/170 (April 5, 1990). (Govt's. Supplemental Exhibit 2). The government, for its part, counters that: (1) the case on which the defendants rely did not involve a section 1692g violation; (2) any arguments regarding section 1692g were made in connection with the proposition that debt collectors are presumed to know

---

*particular* debt." *Masuda v. Thomas Richards & Co.*, 759 F.Supp. 1456, 1461 (C.D.Cal. 1991) (emphasis in original) (discussing violation of 1692e(3)). However much Lanocha and McCarthy may have discussed the possibility of instituting suit against AFP debtors, the fact remains that their discussions concentrated more on whether and how to sue rather than which debtors to sue.[20] To that end, Lanocha investigated the procedures for filing small claims in various states; he did not, after 1984, actually file any suits on behalf of AFP, nor did he intend to do so. Consequently, his statements to this effect constitute a false threat to take legal action. *See CAB*, 667 F.Supp. at 379–381. Exhibits 2, 3, 4A, and 4B also violate section 1692e(10).

The next issue to decide is whether any of the documents violate section 1692g.[21] *Miller* is controlling. In *Miller*, the Fourth Circuit held that a debt collection letter which contained the statements, "THIS IS A DEMAND FOR IMMEDIATE FULL PAYMENT," "PHONE US ... TODAY," and "PAY US—NOW," did not effectively convey notice under section 1692g, despite the presence of both a validation notice on the back of the letter and a reference to that notice on

---

whether the debts they are collecting are valid; and (3) any commentary regarding the adequacy of defendants' notice provisions constitutes pure dicta. (*Government's Memorandum*, at 31–32). After reviewing the ALJ's opinion in the case cited above, I find the government's argument more persuasive. Adequacy of the notice under 1692g was not mentioned in the ALJ's conclusions. The ALJ's discussion of section 1692g focused on whether debtors had an obligation to verify debts *before* sending out collection notices. After determining that no such obligation existed, the ALJ went on briefly to outline what obligations section 1692g did impose; he then noted that the defendants had met those obligations. *In re Robert Smith, et al.*, slip opinion, at 10–11. In making this determination, the ALJ did not consider whether the defendants *effectively* notified debtors of their rights; rather, he simply noted that the notice provisions were included, as required, and that the statute does not require the notice to be presented in any particular manner. Since such cursory conclusions cannot result from "an adequate opportunity to litigate," res judicata cannot be said to apply in this case. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966).

the front. 943 F.2d at 485. In support of its holding, the court relied on the facts that: (1) the statements cited above contradicted the information contained in the validation notice with respect to the thirty day response time for disputed debts; and (2) the statements' presentation, complete with "[s]creaming headlines, bright colors and huge lettering, . . . undercu[t] and overshadow[ed] the message of the validation notice." *Id.*, at 484–85.

■ When measured against the holding in *Miller*, N.F.S.'s referral notice also violates section 1692g. The statements, "DEADLINE NOTICE FROM NATIONAL FINANCIAL SERVICES—A COLLECTION AGENCY," "DEADLINE:," and "YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE," (*Government's Memorandum*, Supplemental Exhibit 3) contradict the validation notice's declaration that the debtor has thirty days to dispute the debt.[22] In addition, the commanding type and prominent display of these statements "undercu[t] and overshadow" the smaller, lighter and less visible declarations of the validation notice and its reference. The statement at the bottom of the collection notice referring the consumer to the reverse side is smaller than any other type on the front of the notice; the statement on the reverse side is printed in light grey ink that is difficult to read.[23] Accordingly, I find that N.F.S.'s collection notice violates section 1692g.

■ The same conclusion can be drawn with respect to Exhibits 2 and 4A. While not exceptionally commanding in their type, the statements, "Immediate payment is required," "I expect your immediate payment," and "Unless this payment is received . . . within five days . . . , I will be compelled to consider the use of legal remedies," (*Government's Memorandum*, Exhibit 2) do contradict the 30 day notice provision; the state-

ment, "YOU HAVE TEN DAYS TO PAY YOUR BILL IN FULL," (*Government's Memorandum*, Exhibit 4A) clearly does the same, and has the added effect of "undercut[ting] and overshadow[ing]" the smaller, less visible validation provision and its reference. Considering the similarity between these statements and those in *Miller*, I find that Exhibits 2 and 4A violate section 1692g of the FDCPA.

■ As for Exhibits 3 and 4B, however, summary judgment must be denied. Exhibit 3 does not contain the contradictory language found in Exhibits 2 and 4A; indeed from the photocopy submitted it cannot be determined whether any notice provision was included. While Exhibit 4B ends with "SIMPLY PAY YOUR BILL NOW," this statement is immediately followed by the notice to the consumer to see the reverse side, and this notice is in larger print than that used in Exhibit 4A. Considering these factual discrepancies, summary judgment is inappropriate.

The government contends that all the defendants should be held "jointly and severally liable" for any violations. Whether and under what circumstances a person other than the particular debt collector whose intent is at issue can be held liable for assisting in a violation of section 1692e(5) is not clear; nor is Lanocha's responsibility for the N.F.S. collection notice established by the evidence submitted to date. The issue of joint liability, as well as an appropriate remedy,[24] will be left for further briefing.

For the reasons stated above, the defendants' motions for summary judgment are denied. The government's motion for partial summary judgment is granted in part and denied in part.

---

22. The "deadline" provided is less than thirty days.

23. Supplemental Exhibit 3 is an original of an N.F.S. "Deadline Notice" submitted at the court's request to verify the appearance of the consumer notice on the reverse side.

24. The government also seeks a judgment finding that the defendants committed a total of over 20 million separate violations and has presented some evidence to support their calculations. This issue will be further addressed, as necessary, in connection with the question of appropriate remedies. Counsel will be contacted to schedule further proceedings.